# IN THE SUPREME COURT OF TEXAS

══════════
No. 12-0045
══════════

ROBERT WAYNE SNEED, JAMES H. TICHENOR, FRED WOLGEL,
JAMES F. O'DONNELL, TEXAS UNITED CORPORATION, AND
UNITED SALT CORPORATION, PETITIONERS,

v.

LLOYD P. WEBRE, JR., INDIVIDUALLY AND DERIVATIVELY ON BEHALF OF
TEXAS UNITED CORPORATION AND UNITED SALT CORPORATION, RESPONDENTS

══════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS
══════════════════════════════════════════════

**Argued September 16, 2014**

JUSTICE GREEN delivered the opinion of the Court.

The business judgment rule in Texas generally protects corporate officers and directors, who owe fiduciary duties to the corporation, from liability for acts that are within the honest exercise of their business judgment and discretion. *See Cates v. Sparkman*, 11 S.W. 846, 848–49 (Tex. 1889). This case involves application of the business judgment rule to a shareholder derivative lawsuit brought on behalf of a closely held corporation. A shareholder of a closely held parent corporation asserted a derivative lawsuit on behalf of the parent corporation's wholly owned subsidiary against one of the subsidiary's directors and several of the subsidiary's officers, managers, and employees for fraud and breach of fiduciary duties. The trial court concluded that the shareholder did not have

standing to bring the derivative lawsuit and granted the defendants' pleas to the jurisdiction and motions to dismiss. The court of appeals reversed and held that the shareholder had double-derivative standing to sue, and that the business judgment rule did not impose a jurisdictional barrier that the shareholder had to overcome to bring a derivative lawsuit on behalf of a closely held corporation. 358 S.W.3d 322, 326 (Tex. App.—Houston [1st Dist.] 2011). The petitioners raise three issues: (1) what role does the business judgment rule play when a shareholder brings a derivative lawsuit on behalf of a closely held corporation; (2) whether a shareholder plaintiff must establish derivative standing by pleading and proving jurisdictional facts to overcome the board of directors' business judgment not to pursue the closely held corporation's cause of action; and (3) whether Texas recognizes the concept of double-derivative standing, which enables a shareholder of a parent corporation to bring a derivative lawsuit on behalf of a wholly owned subsidiary. We affirm the court of appeals' judgment.

## I. Factual and Procedural Background

This case demonstrates the close ties within closely held corporations. In 1926, C.J. Webre started a family business mining salt from underground salt caverns in Hockley, Texas. The family business grew and became profitable. Over time, the family business evolved into multiple corporations and companies, wholly owned subsidiaries, and affiliates that engaged in brine production and salt manufacturing. Texas Brine Company, LLC and other related entities drilled wells into salt caverns to produce and recover brine. The brine producing line of companies also used the underground caverns by injecting gas or liquid hydrocarbons for storage. Texas United

2

Corporation and its wholly owned subsidiary, United Salt Corporation, engaged in the business of manufacturing salt products for sale to retail and business customers.

Ownership of the entities comprising the family business has remained within the Webre family. During the relevant time in this case, four siblings—Lloyd P. Webre, Jr., Camille Webre Tichenor, Mary Iris Webre, and Roberta Webre Rude (collectively the Webre siblings)—each owned roughly 24% of the Class A voting stock in Texas United.[1] In addition, Camille Webre Tichenor's husband, James Tichenor, owned 2.4% of Texas United stock, and the Webre siblings' uncle, Arnold Webre, owned approximately 1.34%. Each Texas United shareholder served on the Texas United board of directors along with Robert Duboise, who formerly served as president of Texas United.

Robert Sneed served as the president and CEO of Texas United. Sneed also served as the secretary and treasurer of Texas Brine. In addition to being a shareholder and board member, James Tichenor served as Texas United's senior vice president. Tichenor also served as the vice president of Texas Brine. Fred Wolgel served as Texas United's vice president and general counsel. Wolgel also served as the vice president and general counsel of Texas Brine.

The four Webre siblings also served on the board of directors of Texas United's wholly owned subsidiary, United Salt, along with Iris P. Webre (their mother), Arnold Webre (their uncle), their brother-in-law James Tichenor (Camille Webre Tichenor's husband), and Robert Duboise. James

---

[1] Texas United also issued non-voting Class B stock, which was owned by each of the Webre siblings, as well as multiple limited partnerships and family trusts.

O'Donnell served as the president and CEO of United Salt.[2] Fred Wolgel served as United Salt's general counsel. Robert Sneed served as United Salt's secretary and treasurer during the relevant time in this case.

Although each of the entities comprising the family business was closely held, the Webre family operated them as if they were larger, publicly traded entities. The entities were managed in full observation of all corporate formalities, there were regular shareholder and board of director meetings, and the entities kept written records of the actions and resolutions taken at those meetings. The family business also employed other staff, employees, and officers to help run the various entities.

## A. The Saltville Acquisition

The dispute in this case arose from a United Salt business deal to acquire a salt mining and storage facility in Saltville, Virginia (the Saltville Acquisition). Beginning in 2006, United Salt's president, James O'Donnell, presented the Saltville Acquisition as a new business opportunity to the board of directors. The acquired land and facilities would be used to recover salt for sale, and a plan was formed to expand the Saltville facilities to drill additional wells to extract salt from the brine and to eventually use the underground caverns created by the brining process for gas storage. Due to concerns over the potential liabilities of operating a gas storage facility, Texas Brine was to create a new subsidiary to acquire the gas storage operations immediately after the Saltville Acquisition.

---

[2] Iris P. Webre served on the United Salt board of directors during the events in question. Prior to December 2007, Iris P. Webre owned 46% of the voting stock in Texas United. At that time, each of her children owned about 12.5%. Sometime around December 2007, Iris P. Webre sold each of the Webre siblings 11.5% of the issued and outstanding Texas United shares, which increased each sibling's overall ownership interest to 24%.

4

Thus, according to the plan, the newly formed subsidiary, Texas Brine Company Saltville, LLC, would acquire the gas storage operations, as well as the associated liabilities, from United Salt at a cost of approximately $3,451,500.

Over the course of several years, corporate records reflect that the United Salt board of directors took numerous votes and actions with respect to conducting, affirming, and ratifying the Saltville Acquisition. Every vote was passed by a majority of the United Salt board of directors. Eventually, the United Salt board became aware that the cost of the Saltville Acquisition was exceeding initial projections, and the board commissioned investigations into the cost overruns to inquire about any possible wrongdoing. The investigations included the hiring of an independent accounting firm to conduct an audit of the Saltville Acquisition, but the accounting firm did not find any fraud or self-dealing in the payment of expenditures or costs. Financial projections for the Saltville Acquisition, which included projected cost overruns, forecasted that the deal would generate a net profit of $46 million over the first ten years. Each of the four Webre siblings, as shareholders of United Salt's parent corporation, Texas United, were projected to receive approximately $10 million in profit from the deal over the same ten-year period.

One United Salt director, Lloyd P. Webre, Jr. (Webre), who was also a Texas United director and shareholder, was not convinced about the profitability of the Saltville Acquisition. He dissented every time the United Salt board took a vote regarding the deal. He even visited the Saltville facility to question its management about his concerns. Time and again, he voiced his concerns at the United Salt director meetings to his family and the other directors, and time and again, a majority of the board of directors voted to proceed with the Saltville Acquisition.

5

## B. The Lawsuit

After the Saltville Acquisition was completed, Webre sued a director and several of the officers and managerial employees of United Salt and other affiliated entities in his individual capacity and derivatively on behalf of United Salt and Texas United. Webre's lawsuit was based on his status as a shareholder in Texas United. Specifically, Webre sued Robert Sneed, James Tichenor, Fred Wolgel, and James O'Donnell (collectively, the individual defendants) as the officers and managers of United Salt and the other entities affiliated with Texas United.[3] Webre's original petition alleged that the individual defendants' initial presentation to the Texas United board of directors about the Saltville Acquisition never mentioned the possibility of operating a gas storage facility at the site. Webre alleged that in later presentations to United Salt's board of directors, the individual defendants presented additional information about the Saltville Acquisition, but again failed to disclose the possibility of future gas storage operations. At that time, according to Webre, the individual defendants were executing corporate documents in connection with the Saltville Acquisition that expressly contemplated that the transaction would include gas storage operations. Webre alleged that the United Salt board of directors relied upon the individual defendants' material non-disclosures and other misrepresentations, which caused United Salt to enter into an unprofitable transaction that lost in excess of $7,000,000 due to the individual defendants' "miscalculations, negligence, errors, mismanagement and lack of proper expertise."

---

[3] James Tichenor was also a director of Texas United and United Salt, and was a minority shareholder of Texas United.

6

Webre amended his petition to allege that the individual defendants "purposely and fraudulently failed to fully inform the directors of United Salt about the full scope of the [Saltville Acquisition], potential liabilities, additional costs, and plans for the future of the Saltville Acquisition and that such actions were fraudulent and a breach of their fiduciary duties." Webre also alleged that the individual defendants breached their fiduciary duties by recklessly entering into contracts on behalf of United Salt that the corporation could not perform, and that they engaged in fraudulent concealment of key information relating to the Saltville Acquisition. Recognizing the large overlap between the management of the entities involved in the Saltville Acquisition, Webre alleged that the respective boards of directors relied heavily on the individual defendants for advice, guidance, and information in making corporate decisions. This heavy reliance enabled the individual defendants to manipulate the respective boards by providing false or incomplete information. Webre alleged that he visited the Saltville site personally, discovered numerous problems associated with the proposed acquisition, and wrote a letter to the individual defendants in April 2007 detailing his concerns. He alleged that the individual defendants failed to fully investigate all of the concerns presented in the letter, and in a special United Salt board meeting later that month, the individual defendants failed to provide the board with complete information to allow the board members to make an informed decision about whether to proceed with the Saltville Acquisition. As a result, a majority of the United Salt board members voted to reaffirm the Saltville Acquisition, and later, according to Webre, the numerous problems he predicted materialized and caused United Salt and Texas United significant financial loss. Webre also accused the individual defendants of knowingly or recklessly supplying

7

false information to the United Salt and Texas United boards of directors to boost the corporations' financial forecasts so the individual defendants would receive higher performance bonuses.

Texas United and United Salt (collectively, the corporations) intervened as indispensable defendants. The corporations and the other individual defendants (collectively, the defendants) filed special exceptions, pleas to the jurisdiction, pleas in abatement, motions for summary judgment, and motions to dismiss that contended, among other things, that Webre lacked standing to assert a shareholder derivative lawsuit.

The trial court found that Webre lacked standing to sue, but it did not elaborate on whether Webre's lack of standing was based on the double-derivative nature of the lawsuit or because his pleadings failed to overcome the business judgment rule. The trial court granted the pleas to the jurisdiction and motions to dismiss the lawsuit, and it did not rule on the motions for summary judgment, pleas in abatement, or special exceptions.

The court of appeals reversed. 358 S.W.3d at 326. Regarding the business judgment rule, the court of appeals held that the trial court should not have dismissed Webre's lawsuit for lack of standing due to his failure to plead and prove that the directors' decision not to pursue the corporation's causes of action was due to fraud or self-dealing. *Id.* at 335–36. The court of appeals also held that because Webre brought a shareholder derivative lawsuit on behalf of a closely held corporation, the written demand requirements of Texas Business Corporation Act (TBCA) article 5.14(C) did not apply to bar the lawsuit.[4] *Id.* at 334, 336–37. In addition, the court of appeals held

_____

[4] The parties do not dispute the court of appeals' application of the TBCA, which formerly governed Texas corporations, to this case. *See* 358 S.W.3d at 326 n.1 (deciding to apply article 5.14 of the TBCA because "[t]he entities at issue here were formed prior to 2006, and this lawsuit was filed on April 13, 2009"); *see also* TEX. BUS. CORP. ACT

that Webre had double-derivative standing to sue because he was a shareholder of Texas United, and he therefore held an equitable ownership interest in United Salt because it was Texas United's wholly owned subsidiary. *Id.* at 333. Finally, the court of appeals held that TBCA article 5.14(L) allowed Webre to pursue direct recovery against the individual defendants by virtue of a derivative lawsuit.[5] *Id.* at 337.

## II. Discussion

This case involves closely held corporations, which are defined as having fewer than thirty-five shareholders and "no shares listed on a national securities exchange or regularly quoted in an over-the-counter market by one or more members of a national securities association."[6] TEX. BUS. CORP. ACT art. 5.14(L)(2). Just last year, we described characteristics that are unique to closely held corporations and those who hold ownership interests in them:

---

art. 11.02 ("This Act expires January 1, 2010."). The Legislature enacted the Texas Business Organizations Code (TBOC) to codify statutes relating to business entities and other for-profit and non-profit private entities, including the provisions contained in article 5.14. *See* Act of May 13, 2003, 78th Leg., R.S., ch. 182, § 1, 2003 Tex. Gen. Laws 267, 448–51 (current version at TEX. BUS. ORGS. CODE §§ 21.551–.563). The TBOC applies to entities formed or converted under Texas law after January 1, 2006. *See* TEX. BUS. ORGS. CODE §§ 402.001, .005. Entities in existence on January 1, 2006, could continue to be governed by former laws until January 1, 2010, after which time all business entities had to conform to the TBOC. *See id.* § 402.005. The parts of the TBCA and TBOC that pertain to closely held corporations are substantially similar and the outcome here would be the same under either statute, but we accept the parties' position that the TBCA is the appropriate statute to apply in this case. *See id.* §§ 402.006, .014.

[5] The court of appeals also held it was not proper to attack subject matter jurisdiction on grounds that Webre was barred by estoppel from bringing a derivative lawsuit because he allegedly benefitted from the Saltville Acquisition. 358 S.W.3d at 334–35. The defendants did not appeal that portion of the court of appeals' ruling.

[6] A "closely held corporation" is not to be confused with a "close corporation." *See Ritchie v. Rupe*, 443 S.W.3d 856, 878 n.34 (Tex. 2014). Only non-publicly traded corporations with fewer than thirty-five shareholders can meet the definition of a "closely held corporation." *See* TEX. BUS. CORP. ACT art. 5.14(L)(2); *see also Ritchie*, 443 S.W.3d at 878 n.34. Any corporation can "elect to operate as a 'close corporation' by so providing in the appropriate corporate documents." *Ritchie*, 443 S.W.3d at 878 n.34; *see also* TEX. BUS. CORP. ACT art. 12.11, 12.13.

By definition, a "closely held" corporation is owned by a small number of shareholders whose shares are not publicly traded. Often, these shareholders enjoy personal relationships as friends or family members in addition to their business relationship. Sometimes, they enter into shareholder agreements to define things like their respective management and voting powers, the apportionment of losses and profits, the payment of dividends, and their rights to buy or sell their shares from or to each other, the corporation, or an outside party. Occasionally, things don't work out as planned: shareholders die, businesses struggle, relationships change, and disputes arise. When . . . there is no shareholders' agreement, minority shareholders who lack both contractual rights and voting power may have no control over how those disputes are resolved. As a group of law school professors . . . observed, minority shareholders in closely held corporations have "no statutory right to exit the venture and receive a return of capital" like partners in a partnership do, and "usually have no ability to sell their shares" like shareholders in a publicly held corporation do; thus, if they fail to contract for shareholder rights, they will be "uniquely subject to potential abuse by a majority or controlling shareholder or group." Unhappy with the situation and unable to change it, they are often unable to extract themselves from the business relationship, at least without financial loss.

*Ritchie*, 443 S.W.3d at 878–79 (footnotes omitted). With these characteristics in mind, we consider the role of the business judgment rule in shareholder derivative actions brought on behalf of closely held corporations. Then we turn to the issue of whether the business judgment rule impacts a shareholder's standing to assert a derivative action on behalf of a closely held corporation. Finally, we address double-derivative standing.

### A. Applicability of the Business Judgment Rule to Closely Held Corporations

In Texas, the business judgment rule protects corporate officers and directors from being held liable to the corporation for alleged breach of duties based on actions that are negligent, unwise, inexpedient, or imprudent if the actions were "within the exercise of their discretion and judgment in the development or prosecution of the enterprise in which their interests are involved."[7] *Cates*, 11

---

[7] We refer to breach of duty claims generally because this case does not require us to consider which duties are subject to the business judgment rule.

S.W. at 849. "Directors, or those acting as directors, owe a fiduciary duty to the corporation in their directorial actions, and this duty 'includes the dedication of [their] uncorrupted business judgment for the sole benefit of the corporation.'" *Ritchie*, 443 S.W.3d at 868 (quoting *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 577 (Tex. 1963)). The business judgment rule also applies to protect the board of directors' decision to pursue or forgo corporate causes of action. *See Cates*, 11 S.W. at 848–49; *Langston v. Eagle Publ'g Co.*, 719 S.W.2d 612, 616 (Tex. App.—Waco 1986, writ ref'd n.r.e.) (citing *Zauber v. Murray Sav. Ass'n*, 591 S.W.2d 932, 936 (Tex. Civ. App.—Dallas 1979), *writ ref'd n.r.e.*, 601 S.W.2d 940 (Tex. 1980) (per curiam)) ("Before a shareholder can bring a derivative suit in the right of a corporation, he must show that something beyond unsound business judgment has governed the board of directors' refusal to act.").

Thus, the business judgment rule traditionally is implicated twice within the life cycle of a shareholder derivative proceeding brought on behalf of a corporation. First, the business judgment rule applies to the board of directors' decision whether to pursue the corporation's cause of action. *See Cates*, 11 S.W. at 849; *Langston*, 719 S.W.2d at 616–17; *see also Pace v. Jordan*, 999 S.W.2d 615, 623 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) ("Under the business judgment rule, a shareholder cannot institute a derivative suit on the corporation's behalf by merely showing that the board's refusal to act was unwise, inexpedient, negligent, or imprudent."). Second, the business judgment rule applies as a defense to the merits of a shareholder's derivative lawsuit that asserts claims against the corporation's officers or directors for breach of duties that result in injury to the corporation. *See Cates*, 11 S.W. at 848–49.

11

The defendants urge us to "reaffirm that the business judgment rule in Texas applies to derivative suits brought on behalf of all corporations, including closely held corporations." The defendants accuse the court of appeals of "removing the protections of the business judgment rule from closely held corporations, [which] conflicts with over 100 years of Texas law represented by *Cates* and its progeny, not to mention equally long-standing authority in other states." In response, Webre contends that "Sections B through H [of article 5.14] provide the statute's traditional 'business judgment rule' provisions, requiring demand, majority vote by the directors, and so forth." Further, Webre argues that the Legislature intended to exempt closely held corporations from those "requirements and defenses" by enacting article 5.14(L). At oral argument, both parties conceded that the business judgment rule applies in derivative proceedings to the merits of the case.

We disagree with the defendants' characterization of the court of appeals' opinion and find no instance where it held that the business judgment rule is entirely inapplicable when derivative suits are brought on behalf of closely held corporations. Instead, the court of appeals held that "sections (B) through (H) of article 5.14 do not apply to derivative suits filed on behalf of closely held corporations." 358 S.W.3d at 336. The court of appeals distinguished *Pace*, which held that "to bring a derivative suit in the right of a corporation, a shareholder must show that the board of directors' refusal to act was governed by something beyond unsound business judgment." *Id.* (quoting *Pace*, 999 S.W.2d at 623). Because *Pace* involved sections of article 5.14 that do not apply to closely held corporations, the court of appeals concluded, "the reasoning in *Pace*, which relied on those provisions [that do not apply to closely held corporations], while applicable then and now to suits brought by a shareholder on behalf of a corporation that is not closely held, does not apply to the instant litigation."

12

*Id.* at 336–37 (citing *Pace*, 999 S.W.2d at 623).  The court of appeals never held that the business judgment rule has no applicability in derivative proceedings involving closely held corporations.  The defendants' assertion to the contrary is misleading.

Our recent decision in *Ritchie* affirms that the business judgment rule applies to closely held corporations.  *See Ritchie*, 443 S.W.3d at 869.  The Legislature's codification of shareholder derivative proceeding procedures in article 5.14 did not alter how the business judgment rule, as announced in *Cates*, applies to the merits of claims against a corporation's officers or directors for breach of corporate duties.  The business judgment rule continues to apply to the merits of a derivative proceeding, whether brought on behalf of a closely held corporation or any other corporation, when a corporation's officers' or directors' actions are being challenged.  The next question we must address is whether the business judgment rule protects a closely held corporation's board of directors' decision not to pursue a corporate cause of action and whether a shareholder plaintiff must plead and prove that such a decision was tainted by fraud, self-interest, or other wrongdoing to establish derivative standing.

### B. The Business Judgment Rule and a Shareholder's Standing to Initiate a Derivative Proceeding on Behalf of a Closely Held Corporation

"Standing is a constitutional prerequisite to maintaining suit in either federal or state court." *Williams v. Lara*, 52 S.W.3d 171, 178 (Tex. 2001) (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993)).  Generally, unless standing is conferred by statute, "a plaintiff must demonstrate that he or she possesses an interest in a conflict distinct from that of the general public, such that the defendant's actions have caused the plaintiff some particular injury." *Id.* at

178–79 (citing *Hunt v. Bass*, 664 S.W.2d 323, 324 (Tex. 1984)). "The issue of standing focuses on whether a party has a sufficient relationship with the lawsuit so as to have a 'justiciable interest' in its outcome." *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex. 2005). "The general test for standing in Texas requires that there '(a) shall be a real controversy between the parties, which (b) will be actually determined by the judicial declaration sought.'" *Tex. Ass'n of Bus.*, 852 S.W.2d at 446 (quoting *Bd. of Water Eng'rs v. City of San Antonio*, 283 S.W.2d 722, 724 (Tex. 1955)).

Standing is a component of subject matter jurisdiction that courts review de novo. *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 646 (Tex. 2004). A plaintiff's lack of standing may be challenged through a plea to the jurisdiction, as well as other procedural devices. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). "A plea to the jurisdiction challenges the court's authority to decide a case." *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 149 (Tex. 2012) (citing *Bland Indep. Sch. Dist.*, 34 S.W.3d at 553–54).

Relying on *Cates*, the defendants contend that the business judgment rule "vests responsibility for decision-making in the corporation's board of directors and precludes shareholders from disrupting the board's decisions through derivative actions when the board has determined a particular action is or is not in the corporation's best interest." The defendants assert that the corporation owns the cause of action, and, under article 2.31 of the TBCA, the board of directors, and not shareholders or even the courts, has the power to manage the corporation's affairs. Included under article 2.31's grant of board-only management is the sole authority to decide whether to pursue the corporation's legal rights in litigation. The defendants cite Delaware case law for the proposition that "[t]he business judgment rule is a threshold issue of substance in *every* derivative suit without exception,

14

because a shareholder suit is in essence a challenge to the board of directors and their managerial power over derivative litigation." According to the defendants, because the business judgment rule is substantive, it "creates a presumption that the directors acted lawfully in taking corporate actions, including refusing to bring derivative suits." Therefore, the defendants contend that for Webre to divest the United Salt board's control over the corporate cause of action and maintain a derivative suit, he must plead and prove that the board of directors acted in a manner that goes beyond unsound business judgment. To obtain standing under the defendants' theory, Webre would have to plead and prove that the board of directors' failure to pursue the corporate cause of action was "characterized by *ultra vires*, fraudulent, and injurious practices, abuse of power, and oppression on the part of the company or its controlling agency clearly subversive of the rights of the minority, or of a shareholder, and which, without such interference, would leave the latter remediless." *Cates*, 11 S.W. at 849 (citation omitted).

Our analysis begins with the statute that governed shareholder derivative suits in Texas during the relevant time in this case, article 5.14 of the TBCA. *See* TEX. BUS. ORGS. CODE § 402.014 (stating that "prior law" applies to actions that were commenced before the mandatory application date of the TBOC). "Article 5.14 was adopted to preserve the principle that a corporation should be run by its board of directors, not a disgruntled shareholder or the courts." *In re Schmitz*, 285 S.W.3d 451, 459 (Tex. 2009) (citing *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 101 (1991)). Article 5.14(B) provides statutory standing for shareholder derivative lawsuits in most instances. It states that "[a] shareholder may not commence or maintain a derivative proceeding unless the shareholder: (1) was a shareholder of the corporation at the time of the act or omission complained of . . . ; and

15

(2) fairly and adequately represents the interests of the corporation in enforcing the right of the corporation." TEX. BUS. CORP. ACT art. 5.14(B). Moreover, article 5.14(C) presents another obstacle for a shareholder plaintiff to overcome because "no shareholder may commence a derivative proceeding until" the shareholder files a written demand with the corporation that explains the shareholder's concerns about the corporation's potential cause of action with particularity and requests the corporation—i.e., the board—to take suitable action. *Id.* art. 5.14(C)(1). Further, article 5.14(F) mandates that courts "shall" dismiss the shareholder derivative lawsuit if independent and disinterested directors or a special investigation committee "determines in good faith, after conducting a reasonable inquiry . . . based on the factors as the person or group deems appropriate under the circumstances," that continuing the derivative proceeding is not in the corporation's best interests. *Id.* art. 5.14(F); *see also Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 392 (Tex. 2014) (citing TEX. GOV'T CODE § 311.016(2)) ("The Code Construction Act makes clear that the use of 'shall' normally imposes a mandatory requirement."). Through these provisions, the Legislature gave directors of most corporations the ability to exercise their business judgment in deciding whether to pursue the corporation's causes of action.

It is critical to recognize, and indeed outcome determinative in this case, that article 5.14's standing, demand, and mandatory dismissal requirements do not apply to shareholder derivative lawsuits brought on behalf of closely held corporations. *See* TEX. BUS. CORP. ACT art. 5.14(L)(1) ("The provisions of Section B through H of this article are not applicable to a closely held corporation."). Thus, with respect to closely held corporations, all that remains is article 5.14(A)(1)'s recognition that a derivative proceeding "means a civil suit in the right of a domestic corporation,"

16

and article 5.14(L)'s recognition that a shareholder of a closely held corporation may bring a derivative proceeding, and, if justice requires, a court may treat the derivative action as a direct action brought by the shareholder for his own benefit and award recovery directly to the shareholder or derivatively to the corporation.[8]  *See id.* art. 5.14(A), (L).  Read together, sections (A) and (L) of article 5.14 establish that a shareholder of a closely held corporation may bring a derivative proceeding in the right of the corporation.

The defendants' position, in essence, asks that we enforce the business judgment rule as a jurisdictional barrier for a shareholder plaintiff to assert a derivative proceeding on behalf of a closely held corporation.  There is no such requirement in the few provisions of article 5.14 that apply to closely held corporations.  The defendants attempt to circumvent this fact by categorizing the business judgment rule as substantive, and they vigorously contend that our decision in *Cates* supports their position.  Webre points out that, outside of *Cates*, the defendants fail to cite any relevant Texas authority for the proposition that the business judgment rule affects derivative standing or prevents courts from exercising subject matter jurisdiction over shareholder derivative lawsuits on behalf of closely held corporations.

The parties agree that *Cates* is the seminal case on the business judgment rule in Texas.  There, the Court posed a lengthy question of whether a shareholder plaintiff's allegations were sufficient to maintain a suit against officers and directors of a corporation for fraudulent practices and

---

[8] A further aspect of article 5.14 remains, despite section (L).  When a derivative proceeding is terminated, the court may order "the plaintiff to pay the expenses of the . . . corporation or any defendant incurred in investigating and defending the proceeding if it finds that the proceeding was commenced or maintained without reasonable cause or for an improper purpose." *Id.* art. 5.14(J)(1)(b).

17

misapplication of corporate assets that allegedly caused the shareholder to suffer loss because the value of his stock depreciated and the corporation had actually or virtually refused to sue on its own behalf. *Cates*, 11 S.W. at 848. After recognizing that the rules supplied by the prevailing authorities at the time were "not altogether reconcilable in this class of cases," the Court explained:

> It may be safely said that courts of equity have not, as a general rule, been disposed to exercise their jurisdiction through suits like the present to control or interfere in the management of the corporate or internal affairs of an incorporated company. The company's business is left to the direction of the officers or managing board which, by the law creating it, may be clothed with the power and discretion to conduct its affairs in the manner which, in their judgment, is best calculated to promote its interests. To justify the interposition of the courts there must exist, as a foundation for such suit, some action,—a threatened action of such board or officers which is beyond the power conferred by its charter,—or such fraudulent transaction completed, contemplated among themselves, or with others, as will result in serious injury to the stockholders suing.

*Id*.

In *Cates*, the Court announced three requirements that were "regarded as indispensable as the basis for such a [shareholder derivative] suit: The company must refuse to sue; there must be a breach of duty; there must be injury to the stockholder." *Id.* at 849 (citation omitted). The Legislature later codified these requirements in article 5.14 of the TBCA. *See* Act of May 26, 1973, 63rd Leg., R.S., ch. 545, § 37, 1973 Tex. Gen. Laws 1486, 1508–09, *amended by* Act of May 13, 1997, 75th Leg., R.S., ch. 375, § 30, 1997 Tex. Gen. Laws 1517, 1540–43 (expired January 1, 2010). With respect to corporate law, we have previously recognized that when the Legislature codifies common law corporate principles, "[t]he effect of these statutes was to supplant the equitable [common law] theory by declaring a statutory equivalent." *Hunter v. Fort Worth Capital Corp.*, 620 S.W.2d 547, 550 (Tex. 1981). Because the Legislature is never presumed to do a useless act, we have held that the enactment

18

of a common law equitable theory into the TBCA "bars resort to the [equitable] theory as it exists apart from the statute." *Id.* at 551. Thus, it is noteworthy that a shareholder's right to sue on behalf of a corporation was "historically an equitable matter." *Ross v. Bernhard*, 396 U.S. 531, 538 (1970); *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949) (discussing the background of shareholder derivative actions and recognizing that "[e]quity came to the relief of the stockholder, who had no standing to bring [a] civil action at law against faithless directors and managers"); *see also Cates*, 11 S.W. at 848–49 (discussing the equitable nature of shareholder derivative actions).

Quite simply, by virtue of Article 5.14, the Legislature codified a shareholder's right to bring a derivative proceeding on behalf of a closely held corporation. *Cf. Williams*, 52 S.W.3d at 178–79 (recognizing that standing can be conferred by statute). In doing so, the Legislature did not require shareholders of a closely held corporation to establish derivative standing by pleading or proving that the directors failed to exercise their honest business judgment in not pursuing the corporate cause of action. In fact, as discussed, the Legislature removed barriers that could prevent a shareholder of a closely held corporation from asserting a derivative lawsuit. *See* Tex. Bus. Corp. Act art. 5.14(L); *cf. Ritchie*, 443 S.W.3d at 864 n.8 ("Closely held corporations have unique attributes that may justify different protections under the law."). Remarkably, the Legislature even removed the requirement that a shareholder in a closely held corporation meet the standing requirement of article 5.14(B) that "[a] shareholder may not commence or maintain a derivative proceeding unless the shareholder . . . fairly and adequately represents the interests of the corporation in enforcing the right of the corporation." Tex. Bus. Corp. Act art. 5.14(B). "When the Legislature includes a right or remedy in one part of a code but omits it in another, that may be precisely what the Legislature

19

intended," and "we must honor that difference." *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 84 (Tex. 2004) (citations omitted). Moreover, "[a]s we consider existing statutory remedies, we are mindful of the principle that, when the Legislature has enacted a comprehensive statutory scheme, we will refrain from imposing additional claims or procedures that may upset the Legislature's careful balance of policies and interests." *Ritchie*, 443 S.W.3d at 880 (citing *Liberty Mut. Ins. Co. v. Adcock*, 412 S.W.3d 492, 493 (Tex. 2013)).

The Court's discussion in *Cates* about the necessity of a shareholder requesting that the corporation bring suit to enforce its rights was a precursor to what is now commonly known as the demand requirement, which was later codified in article 5.14(C). *See* TEX. BUS. CORP. ACT art. 5.14(C). This Court has previously discussed the statutory history of the demand requirement:

> The contours of the demand requirement in Texas law have always been somewhat unclear, in part because shareholder derivative suits have been relatively rare. The original 1941 rules of civil procedure imposed a demand requirement in derivative suits, but that provision was repealed four months after it became effective. It reappeared in 1973 in article 5.14 of the [TBCA], which required that an initial pleading state "[w]ith particularity, the efforts of the plaintiff to have suit brought for the corporation by the board of directors, or the reasons for not making any such efforts."
>
> In 1997, the Legislature extensively revised the [TBCA] "to provide Texas with modern and flexible business laws which should make Texas a more attractive jurisdiction in which to incorporate." Included were changes to article 5.14 to conform Texas derivative actions to the Model Business Corporation Act. Article 5.14(C) now provides that "[n]o shareholder may commence a derivative proceeding until . . . a written demand is filed with the corporation setting forth with particularity the act, omission, or other matter that is the subject of the claim or challenge and requesting that the corporation take suitable action." Unlike Texas law for a century before, the new provision requires presuit demand in all cases; a shareholder can no longer avoid a demand by proving it would have been futile.

20

*In re Schmitz*, 285 S.W.3d at 454–55 (footnotes and citations omitted). It has been recognized that the demand requirement overlaps with the business judgment rule, at least with respect to the board of directors' decision to pursue the corporation's causes of action. *See Kamen*, 500 U.S. at 96 ("The purpose of the demand requirement is to affor[d] the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right.") (quotations omitted).[9]

But this statutory demand requirement does not apply to shareholder derivative proceedings brought on behalf of closely held corporations. *See* TEX. BUS. CORP. ACT art. 5.14(L). We must give meaning to the Legislature's removal of the demand requirement in derivative proceedings brought on behalf of closely held corporations. *See Hunter*, 620 S.W.2d at 551 ("[T]he [L]egislature is never presumed to do a useless act."). In other words, the demand requirement is excused in all instances in which a shareholder asserts a derivative proceeding on behalf of a closely held corporation. *See* TEX. BUS. CORP. ACT art. 5.14(L).

The United States Supreme Court has accurately recognized that "the contours of the demand requirement—when it is required, and when excused—determine *who* has the power to control corporate litigation." *Kamen*, 500 U.S. at 101. "[T]he demand requirement implements 'the basic

<hr />

[9] *See also* Bryan Stanfield, Comment, *For Better or for Worse?: Marriage of the Texas and Model Business Corporation Acts' Derivative Action Statutes and What It Means for Corporations*, 35 TEX. TECH L. REV. 347, 359 n.119 (2004) ("Demand was required to give directors the opportunity to use business judgment for the corporation's best interests, serve the goal of judicial economy by allowing a corporation to pursue non-judicial remedies, and discourage 'strike suits,' which are intended only to benefit a shareholder.") (citing Robert K. Wise, *Demand Futility in Shareholder-Derivative Litigation Under Texas Law*, 28 TEX. TECH L. REV. 59, 66 (1997) (recognizing that the purpose of the demand requirement "advances the fundamental principle of corporate law that the business and affairs of a corporation, including decisions regarding whether a particular claim should be litigated, are managed by directors, rather than by shareholders," and that the demand requirement provides directors an opportunity to exercise their business judgment in deciding whether enforcing the corporation's rights in litigation is in the corporation's best interests).

principle of corporate governance that the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors or the majority of shareholders.'" *Id.* (quoting *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 530 (1984)). But when the demand requirement is excused, such as when it is no longer required by statute, the board of directors' "business judgment bec[omes] irrelevant to the plaintiffs' standing, for it never [is] consulted." *Clark v. Lomas & Nettleton Fin. Corp.*, 625 F.2d 49, 53–54 (5th Cir. 1980); *accord Zauber*, 591 S.W.2d at 939 (recognizing that when a demand is not required, a shareholder may maintain a derivative action despite the fact that the board of directors voted not to pursue the corporation's cause of action). "Ordinarily, it is only when demand is excused that the shareholder enjoys the right to initiate suit on behalf of his corporation in disregard of the directors' wishes." *Kamen*, 500 U.S. at 96 (quotation omitted). We hold that by removing the demand requirement, the Legislature gave shareholders of closely held corporations the right to pursue corporate causes of action derivatively without interference from the board of directors.

Under the same reasoning, we hold that by removing the mandatory dismissal requirement with respect to closely held corporations, the Legislature removed the ability for disinterested and independent directors or a special investigation committee to decide whether continuing the derivative proceeding is in the best interest of the corporation. *See* TEX. BUS. CORP. ACT art. 5.14(F), (L). Because the Legislature excepted closely held corporations from this mandatory dismissal requirement, we decline the defendants' request to reinstate it in an alternative form.

In a similar vein, we address the defendants' contention that to divest a closely held corporation's ownership of a cause of action, a shareholder plaintiff must plead and prove that the

board of director members were not disinterested or acted fraudulently in declining to pursue the corporation's cause of action. This contention mimics the "demand futility" exception from *Cates* that was codified in the pre-1997 version of article 5.14 but was later eliminated. *See In re Schmitz*, 285 S.W.3d at 455. Under the pre-1997 version of the TBCA, "[t]he demand requirement was excused only when demand was deemed to be futile, which occurred when the board of directors lacked impartiality in making a business decision on whether to institute a suit on the corporation's behalf." Stanfield, *supra* note 8, at 359 (citing Wise, *supra* note 8, at 71–72) ("Demand will be excused when the role of the directors in the challenged conduct, or the alleged domination or control of the directors by the alleged wrongdoers, is such that demand would be 'futile.'"); *see also* Act of May 26, 1973, 63rd Leg., R.S., ch. 545, § 37, 1973 Tex. Gen. Laws 1486, 1508–09 (amended 1997) (expired January 1, 2010) (allowing for derivative shareholder plaintiffs to plead demand futility). Some courts reasoned that the demand futility requirement was "not merely an informal procedural step, but rather a requirement necessitating proof at trial." *E.g.*, *Zauber*, 591 S.W.2d at 938.

In essence, the defendants ask us to resurrect the demand futility requirement, not simply as a procedural hurdle, but as an element of a shareholder's standing to pursue a derivative proceeding on behalf of a closely held corporation. Again, we decline this invitation to add a requirement that the Legislature has intentionally omitted.[10] Under the post-1997 version of article 5.14 that is

---

[10] In any event, under the pre-1997 version of article 5.14, special exceptions—and not a plea to the jurisdiction—were the appropriate vehicle to address a shareholder plaintiff's failure to plead with particularity reasons why complying with the demand requirement would have been futile. *See Wingate v. Hajdik*, 795 S.W.2d 717, 718–20 (Tex. 1990); *Dodson v. Kung*, 717 S.W.2d 385, 390 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.); *Zauber*, 591 S.W.2d at 938 ("If the pleadings do not include specific facts and particularized reasons for failing to make demand, the case is subject to being dismissed upon proper exception and after opportunity to amend.").

applicable here, *see* Act of May 13, 1997, 75th Leg., R.S., ch. 375, § 30, 1997 Tex. Gen. Laws 1516, 1540–43 (expired January 1, 2010), a shareholder of a closely held corporation is not required to make a demand as a prerequisite to asserting a derivative suit, much less establish that making a demand would be futile. *See* TEX. BUS. CORP. ACT art. 5.14(L).

Turning our attention back to *Cates*, there the Court examined the other two elements for a shareholder to assert a derivative action against a corporation's officers or directors: "Such breach of duty by the directors or officers of the company, and such injury to the plaintiff's stock, essential to maintain the action."[11]  *Cates*, 11 S.W. at 849.  With regard to the breach of duty element, the element at issue here, the Court explained that courts will not interfere with the officers or directors in control of the corporation's affairs based on allegations of mere mismanagement, neglect, or abuse of discretion.  *Id.*  In contrast, an officer or director's breach of duty that would authorize court interference "is that which is characterized by *ultra vires*, fraudulent, and injurious practices, abuse of power, and oppression on the part of the company or its controlling agency clearly subversive of the rights of the minority, or of a shareholder, and which, without such interference, would leave the latter remediless."  *Id.*  (citations omitted).  The defendants also rely on this part of *Cates*—the discussion pertaining to the requirement that a plaintiff plead a breach of duty that would authorize a court to take action—as supportive of their standing argument.

---

[11] The Court held that the injury requirement was not met because "the petition [did] not allege such facts as would authorize the suit by plaintiff, as an individual stockholder, against the company for damages in the depreciation of the value of his stock, and injury to the corporate property." *Cates*, 11 S.W. at 850 (citing *Evans v. Brandon*, 53 Tex. 56, 60 (1880)).  Accordingly, the *Cates* holding was that the trial court correctly granted the defendants' special exceptions and did not err in dismissing the case when the plaintiff declined to amend his petition. *See id.* at 846, 850.  Here, in contrast, Webre derivatively asserted an injury on behalf of the corporation that the defendants' wrongful conduct diminished its assets, which decreased the value of Webre's shares.  This ends our inquiry into the injury component of derivative standing.

The defendants confuse standing with an issue that goes to the merits.[12] Ultimately, the Court in *Cates* concluded "that [the] character of fraudulent practices, oppressive conduct, abuse of power, and an illegal exercise of discretion subversive of the plaintiff's rights [was] not shown on the part of the officers and directors of the company which are held to be necessary *to maintain a suit* of this kind." *Id.* (emphasis added). This emphasized language is instructive because "[t]he right of a plaintiff *to maintain a suit*, while frequently treated as going to the question of jurisdiction, has been said to go in reality to the right of the plaintiff to relief rather than to the jurisdiction of the court to afford it." *Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 76–77 (Tex. 2000) (emphasis added) (quotation omitted). This statement in *Dubai* squarely applies to the discussion of "court interference" in *Cates*. We recognized in *Dubai* that "[t]he classification of a matter as one of [subject-matter] jurisdiction," such as the defendants' standing argument here, "opens the way to making judgments vulnerable to delayed attack for a variety of irregularities that perhaps better ought to be sealed in a judgment." *Id.* at 76 (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 12 cmt. b (1982)). "It is preferable to 'avoid a result that leaves the decisions and judgments of [a tribunal] in limbo and subject to future attack, unless that was the Legislature's clear intent.'" *In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 310 (Tex. 2010) (quoting *City of DeSoto v. White*, 288 S.W.3d 389, 394 (Tex. 2009)). This Court has adopted "an approach to jurisdictional questions designed to strengthen finality and reduce the possibility of delayed attacks on judgments, regardless of

---

[12] This confusion is understandable. It has been observed that "'[s]tanding' in the context of derivative actions is not to be confused with its more traditional meaning as defining when an individual can challenge governmental action." Daniel R. Fischel, Note, *The Demand and Standing Requirements in Stockholder Derivative Actions*, 44 U. CHI. L. REV. 168, 168 n.5 (1976). "As used in the [shareholder derivative] context, standing defines when minority shareholders can sue despite the opposition of the board of directors or a majority of the shareholders." *Id.*

whether the claim was anchored in common law or was a specially-created statutory action." *City of DeSoto*, 288 S.W.3d at 394 (citation omitted); *accord In re United Servs. Auto. Ass'n*, 307 S.W.3d at 311.

Accordingly, the pronouncement of the business judgment rule in *Cates*, with respect to breaches of duty, goes "in reality to the right of the plaintiff to relief rather than to the jurisdiction of the court to afford it." *See Dubai Petroleum Co.*, 12 S.W.3d at 76–77 (quotation omitted). It is insufficient for a shareholder plaintiff to allege a derivative right to relief against a corporation's officers or directors for breach of a duty based upon "mere mismanagement or neglect . . . , or the abuse of discretion lodged in them in the conduct of the company's business." *Cates*, 11 S.W. at 849. Such allegations may be disposed of on special exceptions or summary judgment.[13] But the *Cates* statement that "unwise or inexpedient" acts would not "authorize the interference by the courts at the suit of a stockholder" is better understood, under *Dubai* and its progeny, as pertaining to what a shareholder plaintiff must plead and prove to establish a derivative right to relief on behalf of the closely held corporation—not to establish standing to invoke a court's subject matter jurisdiction. If a shareholder derivative plaintiff can establish a breach of duty, "the courts will afford a remedy." *See Patton v. Nicholas*, 279 S.W.2d 848, 854 (Tex. 1955); *accord Ritchie*, 443 S.W.3d at 885.

Today's decision follows our recent opinion in *Ritchie*. In *Ritchie*, while discussing the successor statute to article 5.14, we recognized that "the Legislature has enacted special rules to allow its shareholders to *more easily* bring a derivative suit on behalf of the corporation." *Ritchie*,

---

[13] The defendants also filed pleas in abatement, special exceptions, and motions for summary judgment in this case. The trial court may consider those matters on remand.

443 S.W.3d at 880–81 (emphasis added) (citing TEX. BUS. ORGS. CODE § 21.563). This legislatively imposed ease of court accessibility enables shareholders of closely held corporations to bring derivative actions "without having to prove that they 'fairly and adequately represent[] the interests of' the corporation, without having to make a 'demand' upon the corporation, as in other derivative actions, and without fear of a stay or dismissal based on actions of other corporate actors in response to a demand." *Id.* (citations omitted). Despite the Legislature's removal of these impediments to promote greater court accessibility for shareholders of closely held corporations, the defendants propose an additional judicially created barrier. As we stated in *Ritchie*, "we will refrain from imposing additional claims or procedures that may upset the Legislature's careful balance of policies and interests." *Id.* at 880 (citation omitted). We emphasized in *Ritchie* the availability of the shareholder derivative action and other existing remedies in the closely held corporation context, which reflected a careful balance of legislative policy judgments that made it unnecessary to recognize a new common law claim for shareholder oppression. *See generally id.* at 876–91. Following this reasoning, we decline to impose extra-statutory barriers to shareholder derivative lawsuits in the closely held corporation context so such lawsuits can provide the protections that the Legislature intended. *See id.*

Not only does today's decision align with *Cates* and *Ritchie*, but our holding is also consistent with this Court's other jurisprudence on shareholder lawsuits. The defendants rely on several statements from *Massachusetts v. Davis*, 168 S.W.2d 216 (Tex. 1942), and *Wingate v. Hajdik*, 795 S.W.2d 717 (Tex. 1990), regarding the unavailability of direct shareholder recovery for injuries to the corporation. Both cases stand for the proposition that shareholders have no individual

27

or direct claims for injuries to the corporation. *See Wingate*, 795 S.W.2d at 719; *Davis*, 168 S.W.2d at 221. These holdings are reflected in our statutes. Under article 5.14(L), there is not an absolute right for a shareholder to recover directly for claims based on corporate injuries. Rather, if justice requires, a court may treat a derivative proceeding like a direct action and allow the shareholder to recover directly. TEX. BUS. CORP. ACT art. 5.14(L). But the proceeding still must be derivative. *See id.*; *Swank v. Cunningham*, 258 S.W.3d 647, 665 (Tex. App.—Eastland 2008, pet. denied) ("A trial court's decision to treat an action as a direct action . . . so as to allow recovery to be paid directly to a shareholder plaintiff, as opposed to the corporation, does not mean that the action is no longer a derivative proceeding."). In *Wingate*, the Court simply held that a shareholder may still recover damages "for wrongs done to him individually 'where the wrongdoer violates a duty arising from contract or otherwise, and owing directly by him to the stockholder.'" 795 S.W.2d at 719 (quoting *Davis*, 168 S.W.2d at 222). But to recover in an individual capacity for non-derivative claims, the shareholder "must prove a personal cause of action and personal injury." *Id.*

Further, the case of *Pledger v. Schoellkopf*, 762 S.W.2d 145 (Tex. 1988) (per curiam), which the defendants rely upon in support of their standing argument, is not inconsistent with our holding today. *Pledger* involved a shareholder's cross-claim against fellow shareholders for fraud, tortious interference with business relationships, and material misrepresentations. *Id.* at 145. The court of appeals reversed a jury verdict that was in the plaintiff's favor because the causes of action belonged to the corporation and the plaintiff and cross-defendants were its shareholders. *Id.* This Court held that the shareholder plaintiff was entitled to recover because the cross-defendants waived their right to complain about the capacity in which the shareholder plaintiff sued them by failing to file a

28

verified denial under Texas Rule of Civil Procedure 93(2). *Id.* at 146. "When capacity is contested, Rule 93(2) requires that a verified plea be filed anytime the record does not affirmatively demonstrate the plaintiff's or defendant's right to bring suit or be sued in *whatever* capacity he is suing." *Id.* (citing TEX. R. CIV. P. 93(2)). The Court did not address whether a shareholder plaintiff's pleadings must overcome the business judgment rule to sue on behalf of a corporation in a representative capacity.

Finally, as Webre points out, our decision in *Eye Site, Inc. v. Blackburn*, 796 S.W.2d 160 (Tex. 1990), cuts against the defendants' position. At the outset of that opinion, the Court made a point to "confirm that the complaints raised by [the shareholder plaintiff] belong exclusively to [the corporation]." *Id.* at 161. At that time, the Texas Rules of Civil Procedure contained a requirement that "[t]he derivative suit may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders similarly situated in enforcing the right of the corporation." *Id.* (quoting former TEX. R. CIV. P. 42(a) (1940, amended 2003)). We noted that this procedural rule was patterned after Federal Rule of Civil Procedure 23.1, "which is designed to prevent shareholders from interfering with legitimate discretion in corporate governance and suing in place of the corporation where doing so disserves the legitimate interests of the corporation or its shareholders." *Id.* (citing *Daily Income Fund, Inc.*, 464 U.S. at 531–32 & n.7). The Court concluded that "[t]he literal terms of [the former Texas Rule of Civil Procedure] and the need to provide a remedy in instances of corporate misconduct convince us that we cannot preclude the sole dissenting shareholder in a close corporation from enforcing the right of the corporation." *Id.* at 162. The Court observed that the shareholder plaintiff was in a unique position "[a]s the sole minority

29

shareholder representing the corporation against all other shareholders, . . . and his interests differ[ed] from those of the remaining shareholders." *Id.* at 163. The Court held that the shareholder plaintiff was "in compliance with our corporation laws and our derivative action rule, and he has standing to pursue the corporation's claim." *Id.*

Accordingly, we reaffirm that when a shareholder of a closely held corporation brings a derivative proceeding "in compliance with our corporation laws and our derivative action rule, . . . he has standing to pursue the corporation's claim." *Id.* Through sections (B) through (H) of article 5.14, the Legislature has given directors of publicly traded corporations the ability to exercise their business judgment in handling the corporation's legal disputes. *See* Tex. Bus. Corp. Act art. 5.14(B)–(H). By virtue of article 5.14(L), closely held corporations do not have the same deference to their boards of directors' decision-making with respect to pursuing corporate causes of action. *See id.* art 5.14(L). When a closely held corporation is injured, and such an injury decreases the value of its shares, its shareholders have standing to pursue the corporation's causes of action derivatively. Thus, courts have jurisdiction to decide shareholder derivative litigation brought on behalf of closely held corporations, and it is immaterial whether the board of directors approves or disapproves of the derivative litigation. The court of appeals properly concluded that the business judgment rule does not deprive Webre of standing to assert a derivative proceeding on behalf of a closely held corporation in this case. *See* 358 S.W.3d at 335–37.

## C. Double-Derivative Standing

We next address whether the court of appeals erred in recognizing the concept of double-derivative standing. "In a 'double derivative' action, the shareholder is effectively maintaining the

30

derivative action on behalf of the subsidiary, based upon the fact that the parent or holding company has derivative rights to the cause of action possessed by the subsidiary." *Blasband v. Rales*, 971 F.2d 1034, 1043 (3rd Cir. 1992) (quoting 13 CHARLES R.P. KEATING, GAIL A. O'GRADNEY, FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 5977 (rev. ed. 1991)). Texas United is the sole shareholder of United Salt. Webre asserts that he has standing to bring a derivative suit on behalf of United Salt because he is a shareholder of United Salt's only shareholder, which provides him with a beneficial or equitable ownership interest in United Salt under the reasoning of *Roadside Stations, Inc. v. 7HBF, Ltd.*, 904 S.W.2d 927 (Tex. App.—Fort Worth 1995, no writ). The defendants contend that only the actual shareholder of a corporation can bring a derivative suit in that corporation's name, and that the definition of a shareholder in the TBCA includes only "shareholders of the corporation whose cause of action he or she purports to prosecute." The court of appeals agreed with Webre that, under the reasoning set out in *Roadside*, "Webre, as a stockholder in Texas United, is also an equitable owner of stock in United Salt because Texas United owns all of the stock in United Salt." 358 S.W.3d at 333 (citing *Roadside Stations, Inc.*, 904 S.W.2d at 931). We agree with Webre and the court of appeals.

In the TBCA, a shareholder is defined to mean "the person in whose name shares issued by a corporation are registered at the relevant time in the share transfer records maintained by the corporation." TEX. BUS. CORP. ACT art. 1.02(A)(22). In the "Derivative Proceedings" provisions, article 5.14(A)(2) defines a shareholder: "'Shareholder' *includes* a beneficial owner whose shares are held in a voting trust or by a nominee on the beneficial owner's behalf." *Id.* art. 5.14(A)(2) (emphasis added). Under the Code Construction Act, "'[i]ncludes' and 'including' are terms of

enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded." TEX. GOV'T CODE § 311.005(13).

Turning to *Roadside*, which Webre relies upon for its recognition of equitable ownership, there the court addressed a question of first impression of "whether a stockholder in the parent company can bring a suit on behalf of a subsidiary." *Roadside Stations, Inc.*, 904 S.W.2d at 930. At that time, the pre-1997 version of the TBCA stated that a derivative suit may be brought if "[t]he plaintiff was a record or beneficial owner of shares . . . at the time of the transaction of which he complains." *Id.* (citing the pre-1997 version of TEX. BUS. CORP. ACT art. 5.14(B)(1), Act of May 26, 1973, 63rd Leg., R.S., ch. 545, § 37, 1973 Tex. Gen. Laws 1486, 1508–09 (amended 1997) (expired January 1, 2010)). The court ultimately answered the question by holding:

> Stockholders of a corporation are the equitable owners of the assets of the corporation. Consequently, 7HBF, as a stockholder with a fifty percent interest in Nu–Way, Inc., also is an equitable owner of fifty percent of the stock of Nu–Way Distributing Co. because Nu–Way, Inc. is the owner of all stock in Nu–Way Distributing Co. We agree . . . that such an equitable ownership interest gives one standing to bring a derivative suit. Therefore, we conclude 7HBF has standing to bring this derivative suit.

*Id.* at 931 (citations omitted).

In the instant case, the court of appeals applied *Roadside*'s reasoning and held that Webre's ownership of Texas United stock made him an "equitable owner of stock in United Salt because Texas United owns all of the stock in United Salt." 358 S.W.3d at 333 (citing *Roadside Stations, Inc.*, 904 S.W.2d at 931). In reaching its decision, the court of appeals explained that the post-1997 version of article 5.14(A) allows a "shareholder" to bring a derivative lawsuit, and "the applicable

version of article 5.14(A) does not exclude 'equitable owners' from its definition of a shareholder."

*Id.* (citing TEX. BUS. CORP. ACT art. 5.14(A)(2)).

The Court recognized that "the stockholders are the beneficial owners of the assets of the corporation" well over a century ago. *See Aransas Pass Harbor Co. v. Manning*, 63 S.W. 627, 629 (Tex. 1901). Recognition of a shareholder's beneficial or equitable ownership interest is based on reasoning that "the shareholders are the ultimate owners of the corporate property [because] when the corporation is dissolved and its creditors are satisfied, they hold title to the assets in proportion to their respective shares." *Id.* Fifty years after *Aransas Pass Harbor Co.*, the Court reiterated that the concept of beneficial ownership means "the beneficial title to the assets of the corporation is in the stockholders." *Humble Oil & Ref. Co. v. Blankenburg*, 235 S.W.2d 891, 894 (Tex. 1951). The Court held the plaintiff met the burden of proving he held title to stock in a corporation to maintain a suit involving the corporation's property: "As the owner of 90 shares of the stock petitioner is the beneficial owner of its proportionate part of the corporation's assets and thus is the beneficial owner of an undivided interest in the property for which it sues." *Id.* Further, we recently examined the definitions of "beneficial interest" and "beneficial ownership" in the context of transferring interests in a partnership and a limited liability company:

> The legal dictionary broadly defines "beneficial interest" as "[a] right or expectancy in something (such as a trust or an estate), as opposed to legal title to that thing." BLACK'S LAW DICTIONARY 885 (9th ed. 2009). Similarly, we have said that "'beneficial interest' is profit, benefit or advantage resulting from contract or ownership of estate as distinct from legal ownership or control." *Satterlee v. Gulf Coast Waste Disposal Auth.*, 576 S.W.2d 773, 777 (Tex. 1978) (citing *Christiansen v. Dep't of Soc. Sec.*, 15 Wash. 2d 465, 131 P.2d 189 (1942)). Record title, on the other hand, typically refers to legal evidence of a person's ownership rights in property. *See Longoria v. Lasater*, 292 S.W.3d 156, 165 (Tex. App.—San Antonio

33

2009, pet. denied) (citing BLACK'S LAW DICTIONARY 1523 (8th ed. 2004)). "Beneficial ownership" is defined as "[a] beneficiary's interest in trust property" or "a corporate shareholder's power to buy or sell the shares, though the shareholder is not registered on the corporation's books as the owner." BLACK'S LAW DICTIONARY 1215 (9th ed. 2009).

*Milner v. Milner*, 361 S.W.3d 615, 620–21 (Tex. 2012). Some courts have phrased this concept of beneficial ownership or interest as one of equitable ownership. *E.g.*, *Cotten v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 697 (Tex. App.—Fort Worth 2006, pet. denied), *disapproved of on other grounds by Ritchie*, 443 S.W.3d 856 ("[S]hareholders of a corporation are equitable or beneficial owners of the corporation's assets."); *Martin v. Martin, Martin & Richards, Inc.*, 12 S.W.3d 120, 124 (Tex. App.—Fort Worth 1999, no pet.) (stating that "[t]he shareholders of a corporation are the equitable owners of its assets," and that shareholders are the "beneficial owners of corporate property"); *Boston & Tex. Corp. v. Guarantee Life Ins. Co.*, 233 S.W. 1022, 1024 (Tex. Civ. App.—Galveston 1921, writ ref'd) ("[T]he doctrine that the stockholders of a corporation are in final analysis the equitable owners of its property . . . . is well fortified by authority in Texas, as well as elsewhere."). No matter the terminology, this Court has never called into doubt the now familiar understanding that "the stockholders are the [beneficial or equitable] owners of the assets of the corporation." *See Aransas Pass Harbor Co.*, 63 S.W. at 629.

Accordingly, we agree with *Roadside* and the court of appeals' reasoning. Article 5.14(A)(2)'s definition of a shareholder uses the term "includes," which "does not create a presumption that components not expressed are excluded." TEX. GOV'T CODE § 311.005(13). Thus, under article 5.14(A)(2), a shareholder certainly includes "a beneficial owner whose shares are held in a voting trust or by a nominee on the beneficial owner's behalf," but a shareholder may also

34

include other types of beneficial ownership—like when a shareholder of a parent holding corporation has a beneficial or equitable ownership interest in a wholly owned subsidiary. Our holding is once again buttressed by the fact that the Legislature made the statutory standing provisions of article 5.14(B) inapplicable to closely held corporations. *See* TEX. BUS. CORP. ACT art. 5.14(L). Because section (B) did not apply to Webre, he was not required to be "a shareholder of the corporation [i.e., United Salt] at the time of the act or omission complained of." *See* TEX. BUS. CORP. ACT art. 5.14(B), (L). Giving meaning to the Legislature's removal of the requirement that Webre must be a shareholder in United Salt to assert a derivative lawsuit on its behalf is consistent with our conclusion that "the Legislature has enacted special rules to allow [a closely held corporation's] shareholders to more easily bring a derivative suit on behalf of the corporation." *Ritchie*, 443 S.W.3d at 880–81 (citing TEX. BUS. ORGS. CODE § 21.563). Thus, in the closely held corporation context, the derivative plaintiff is not required to be a shareholder of the corporation he is bringing suit on behalf of, and the definition of a shareholder does not exclude those with a beneficial or equitable interest in a subsidiary. We conclude that the Legislature has provided for double-derivative suits of this nature.[14]

Were we to hold otherwise, the directors of a closely held holding corporation could create a wholly owned subsidiary to circumvent the Legislature's intent to make it easier for shareholders

---

[14] We limit our holding to the situation presented in this case in which a shareholder of a closely held parent corporation asserts double-derivative standing to assert a cause of action on behalf of a wholly owned subsidiary. This situation is distinct from one in which a purported shareholder attempts to pursue a derivative action based on conduct that occurred before the purported shareholder held an ownership interest in any shares of any corporation. *See, e.g.*, *Willis v. Donnelly*, 199 S.W.3d 262, 276–78 (Tex. 2006) (declining to decide the question of "whether Texas law recognizes a doctrine of equitable title to stock and the contours of such a doctrine" because "all the alleged breaches of fiduciary duty occurred before [the plaintiff] became a shareholder and before he was entitled to shareholder status").

to assert derivative proceedings on behalf of closely held corporations. *See id.* In considering this precise issue, the Supreme Court of Illinois recognized that refusal to recognize double-derivative standing would leave "[a] shareholder of record in the holding company . . . without remedy, even where . . . the holding company is the wrongdoer." *Brown v. Tenney*, 532 N.E.2d 230, 233 (Ill. 1988). "The additional layer in the corporate structure would prevent the righting of many wrongs and would insulate the wrongdoer from judicial intervention." *Id.* (citation omitted); *cf. Zauber*, 591 S.W.2d at 937 ("The reasoning behind allowing a shareholder to maintain a suit in the name of the corporation when those in control wrongfully refuse to maintain it is that a shareholder has a proprietary interest in the corporation."). We believe such a result would be contrary to the Legislature's intent in removing the restrictions for shareholder derivative proceedings in the closely held corporation context. Thus, in the closely held corporation context, we reject "an interpretation [that] could deprive the corporation of any remedy it might have as the result of wrongs done it by the major shareholders." *Eye Site, Inc.*, 796 S.W.2d at 163.

It is axiomatic that standing to assert a derivative action on behalf of a wholly owned subsidiary requires standing to assert a derivative action on behalf of the parent corporation. As a shareholder of Texas United, Webre has an equitable or beneficial ownership interest in Texas United's assets. Texas United owns all of United Salt and the right to assert a shareholder derivative proceeding on behalf of United Salt. We have already concluded that Webre has standing to assert a derivative proceeding on behalf of Texas United, and therefore, he has standing to assert a derivative proceeding on behalf of United Salt. The court of appeals did not err in reaching the same conclusion. *See* 358 S.W.3d at 332–34.

36

### III. Conclusion

The Legislature's enactment of the TBCA did not alter the way the business judgment rule applies to the merits of derivative lawsuits alleging that the directors or officers of a closely held corporation breached their duties to the corporation. To achieve standing to assert a derivative proceeding under TBCA article 5.14, a shareholder of a closely held corporation is not required to plead and prove that the board of directors acted outside of the protections of the business judgment rule in deciding not to pursue the corporation's cause of action. Finally, we hold that Texas law recognizes the availability of double-derivative standing for shareholders of a closely held parent corporation to assert a derivative action on behalf of a wholly owned subsidiary. The court of appeals correctly reversed the trial court's grant of the defendants' pleas to the jurisdiction and motions to dismiss. We affirm the court of appeals' judgment and remand this case to the trial court for further proceedings.

_____
Paul W. Green
Justice

OPINION DELIVERED: May 29, 2015