# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## ON MOTION FOR REHEARING

---

## NO. 03-25-00746-CV

---

**In re Kona Coast Venture, LTD; Kona Coast, LLC; William Korioth; WTK Development, LLC; Guadalupe 306, LP; Guadalupe 306 GP, LLC; Oxbow Land Partners, LLC; Hideout on the Horseshoe, LLC; Whitewater Sports, LLC; and TBOTG Development, Inc.**

---

### ORIGINAL PROCEEDING FROM COMAL COUNTY

---

## O P I N I O N

We withdraw the opinion and judgment issued on January 8, 2026, and substitute the following opinion and judgment in their place. We deny Relators' motion for rehearing and emergency motion for temporary relief. The motion for en banc reconsideration is moot.

Relators filed this original proceeding challenging two orders by the trial court: (1) striking the verified plea in intervention by four companies on whose behalf plaintiffs assert derivative claims and denying the intervenor companies' request to appoint an independent panel to determine how to proceed on the derivative claims; and (2) compelling Relators to produce certain documents for *in camera* review that they contend are privileged. We conditionally grant mandamus relief on the first order based on the Texas Business Organizations Code's provisions concerning derivative-suit formalities applicable to closely held limited-liability companies

(LLCs) and limited partnerships. *See* Tex. Bus. Orgs. Code §§ 101.451–.463 (derivative proceedings applicable to LLCs); 153.401–.413 (derivative proceedings applicable to limited partnerships). Because Relators have not established that the trial court abused its discretion by ordering the documents to be submitted for *in camera* review before compelling production, we deny the requested relief as to the second order.

## BACKGROUND[1]

William Korioth and Andrew Priest are Texas-based business investors and developers. In 2005, Korioth founded Kona Coast Venture, Ltd., which owns and operates the Whitewater Amphitheatre in New Braunfels. Priest founded Whitewater Investment Partners, which he manages and is the majority owner of through his company, Priest Equities, LLC. In 2014, Whitewater Investment Partners joined Kona Coast Venture (the partnership) as a limited partner. At the time, Kona Coast Venture also owned and operated Whitewater Sports, LLC, a recreational tubing business, and Hideout on the Horseshoe, LLC, a property with several rental cabins. Korioth now owns 61% of Kona Coast Venture, and Whitewater Investment Partners owns 31%; the remaining 8% is owned by individual limited partners. Kona Coast LLC, which Korioth manages, is Kona Coast Venture's general partner. Real Parties in Interest in this proceeding are Whitewater Investment Partners, Priest, and Priest Equities.

In July 2014, Korioth and Priest signed an amended and restated partnership agreement for Kona Coast Venture. The agreement states that—"unless approved by a Super

---

[1] This is the second time this underlying case has been before this Court, and most of the background facts are derived from our prior opinion. *See Korioth v. Whitewater Inv. Partners, LLC*, No. 03-25-00240-CV, 2025 WL 3165922 (Tex. App.—Austin Nov. 13, 2025, no pet. h.) (mem. op.) (reversing temporary injunction).

2

Majority in Interest"[2]—Kona Coast Venture is to "operate for the limited purpose of owning and operating a music venue that has bands or DJs entertain paying customers ('the Business') on 9.0 acres of real property owned by the Company in or near New Braunfels, Texas, and any actions and transactions related or ancillary thereto." The agreement imposes two duties on Kona Coast Venture's limited partners that are central to this litigation: a partner's right of first refusal for "an opportunity relating to the Business . . . that the Partner or a Controlling Party desires to accept," and a two-year noncompete for any work or ownership in "the Business" "within a two hundred (200) mile radius of" the Whitewater Amphitheatre. The agreement generally provides that Kona Coast Venture may remove a partner for violating the noncompete provision. But the agreement also expressly contemplates that, subject to these provisions and others, limited partners may "engage in whatever activities they choose, whether the same are competitive with the Partnership or otherwise, without having or incurring any obligation to offer any interest in such activities to the Partnership or any Partner."

After Whitewater Investment Partners joined Kona Coast Venture, the partnership invested in several business opportunities, including the renovation of a condominium complex, the development of a 77-acre tract into a 57-lot residential subdivision called the Oxbow, and the purchase of a tubing business with a restaurant. Korioth and Priest also individually pursued various business opportunities during this time, some of which they shared with each other and some of which they did not.

---

[2] The agreement defines "Super Majority in Interest" as "a vote of at least a majority of the Units of all Limited Partners so long as (a) Whitewater Investment Partners, LLC and (b) Will Korioth or a Korioth Permitted Assignee is included in such majority for so long as each of the foregoing are Limited Partners." The agreement specifies that many of Kona Coast Venture's actions require the consent of a super majority in interest, including participating in a merger or sale "outside the ordinary course of business," raising capital, and making distributions to partners.

In 2020, through a new entity, Guadalupe 306, Korioth purchased a 165-acre tract near some of the partnership's businesses, including the Whitewater Amphitheatre and the Oxbow, and began to develop that property into another residential subdivision called the Bluffs on the Guadalupe. Guadalupe 306 later transferred its ownership interest in the Bluffs development project to a new entity, TBOTG Development. Neither Whitewater Investment Partners nor Priest's other ventures are involved in the Bluffs development project, though Korioth did have preliminary discussions about the investment with Priest before moving forward without him.

Following Korioth's new business venture, Whitewater Investment Partners sued Korioth; WTK Development, LLC; Kona Coast LLC; and the Guadalupe 306 entities in Comal County for breach of contract, breach of fiduciary duties, fraud, conspiracy, tortious interference with existing contracts and prospective relations, and declaratory judgment. Whitewater Investment Partners also asserted the claims derivatively on behalf of Oxbow Land Partners, Hideout on the Horseshoe, Whitewater Sports, and Kona Coast Venture. The suit also sought to remove Korioth and entities he controls from their roles as general partner, manager, and officer of the plaintiff entities. The suit sought a constructive trust for the plaintiffs' purported interest in the Bluffs, as well as attorneys' fees and an accounting of the defendant businesses.

Generally, the suit maintains that through the acquisition and development of business ventures after Whitewater Investment Partners joined the Kona Coast Venture partnership in 2014, the partners effectively expanded the "limited purpose" of the "Business" to include the development of certain real estate, such that Korioth wrongly kept Priest and his entities from participating in the Bluffs development under the partnership agreement's right-of-first-refusal provision. And because, as the plaintiffs maintain, the business's purpose now includes residential

4

real-estate developments, Korioth's development of the Bluffs also violates the partnership agreement's noncompete provision.

As discovery progressed, Korioth learned about some of Priest's post-2014 investments, including multiple residential and commercial real-estate developments within 200 miles of the Whitewater Amphitheatre, including the South Congress Hotel, and two bars[3] on Austin's Sixth Street. In response, in 2022, Korioth asserted a counterclaim against Whitewater Investment Partners and Priest and Priest Equities as third-party defendants, arguing that Priest had materially breached the Kona Coast Venture partnership agreement before he purchased the Bluffs and seeking to remove Whitewater Investment Partners from the partnership. At the same time, on February 11, 2022, Kona Coast, LLC, through its manager, Korioth, sent Priest, Whitewater Investment Partners, and Priest Equities, a notice of Whitewater Investment Partners' removal for cause from the Kona Coast Venture partnership based on purported breaches of the partnership agreement. But Korioth backed off that claim until February 23, 2024, when he and Kona Coast, LLC again sent a notice of Whitewater Investment Partners' removal from the partnership based on violations of the noncompete clause in the partnership agreement, specifically referring to the two Sixth Street bars.

Meanwhile, Korioth also sued Priest in Travis County for a declaratory judgment regarding whether Priest's investment in the Sixth Street bars constituted a breach of the Kona Coast Venture partnership agreement and in Hays County related to a dispute over a commercial real-estate venture that the two bought together outside of the Kona Coast Venture partnership.

---

[3] Whether these bars are correctly characterized as "music venues" or "drink bars" is hotly contested, but it is undisputed that the two bars—the Chuggin' Monkey and the Dizzy Rooster—regularly featured live music and DJs.

While these disputes were proceeding, TBOTG Development (which Whitewater Investment Partners had added as a defendant in this suit) defaulted on its loan and sought Chapter 11 bankruptcy protection, which Korioth blames on the constructive-trust pleading in this case. TBOTG Development's bankruptcy proceedings stayed this litigation for over a year. In the meantime, Kona Coast Venture defaulted on over $11.5 million in debt secured in part by the Whitewater Amphitheatre, and the lender expressed its intent to foreclose; however, a new owner bought the note and withdrew the foreclosure sale.

Soon after the bankruptcy stay was lifted, Kona Coast Venture, Oxbow Land Partners, Hideout on the Horseshoe, and Whitewater Sports (the intervenor companies) filed a plea in intervention as "indispensable defendants" based on the derivative claims and moved for the trial court to appoint an independent panel to assess the claims under the Business Organizations Code's applicable provisions.[4] *See* Tex. Bus. Orgs. Code §§ 101.454, 153.404. Whitewater Investment Partners responded and requested that the trial court strike the intervention and deny the intervenor companies' request to appoint an independent panel to assess the derivative claims.[5] Following a hearing, the trial court granted Whitewater Investment Partners' request and on October 2, 2025, it signed an order striking the plea in intervention and denying the motion to appoint an independent panel.

---

[4] The intervenor companies recommended that the trial court appoint the Honorable Patricia Alvarez, a retired justice from the Fourth Court of Appeals.

[5] This omnibus filing also contained a motion to show authority under Rule 12 based on Whitewater Investment Partners' claim that they brought claims "directly," as well as derivatively, on behalf of the intervenor companies; however, Whitewater Investment Partners abandoned this position at a hearing before the trial court, and the Rule 12 motion is not at issue in this original proceeding.

Whitewater Investment Partners also separately filed a motion to compel documents from Scott Orr, the CFO of Guadalupe 306 and TBOTG Development, which the defendants objected to based on attorney-client privilege. After a hearing, the trial court granted the motion to compel but stated that any documents the defendants consider to be privileged first may be made available to the trial court for *in camera* inspection or, if the defendants prefer, to a special master. The order also clarified that providing documents for *in camera* inspection by the trial court or review by a special master would not be construed as a waiver to resist production in the future.

The intervenor companies (Kona Coast Venture, Oxbow Land Partners, Hideout on the Horseshoe, and Whitewater Sports) and remaining defendants (Kona Coast, LLC; William Korioth; WTK Development, LLC; Guadalupe 306, LP; Guadalupe 306 GP, LLC; and TBOTG Development, Inc.) (collectively, Relators) seek mandamus relief from the trial court's orders (1) striking the plea in intervention and denying the motion to appoint an independent panel, and (2) granting the motion to compel.

**DISCUSSION**

Mandamus is an extraordinary remedy and will issue only if the lower court has clearly abused its discretion and the relators have no other adequate remedy by appeal. *In re H.E.B. Grocery Co.*, 492 S.W.3d 300, 302 (Tex. 2016) (orig. proceeding). "[A] clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion, and may result in appellate reversal by extraordinary writ." *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding). Relators maintain that they are entitled to mandamus relief because the trial court abused its discretion by striking the motion to intervene, denying the intervenors' motion to

7

appoint an independent panel to review the derivative claims, and compelling the production of certain documents. Relators also argue they lack an adequate remedy by appeal.

**I.       Relators established their right to mandamus relief from the trial court's order striking the motion to intervene and denying the motion to appoint an independent panel to assess the derivative claims.**

*Intervention*

In their first issue, Relators contend that the trial court abused its discretion by striking the plea in intervention. Relators argue that the trial court's order striking the intervention means that the intervenor companies cannot properly participate in this litigation or be represented by counsel of their choice. And because Relators maintain that the intervenor companies are necessary parties to this lawsuit based on Real Parties' derivative claims asserted on the companies' behalf, they argue that the trial court abused its discretion by striking the motion to intervene, denying the motion to appoint an independent panel per sections 101.454(a)(3) and 153.404(a)(3) of the Business Organizations Code, and allowing the suit to proceed without the intervenor companies' interests properly represented.

First, as a threshold matter, Real Parties argue that the Relators waived this argument by filing a plea in intervention and instead should have filed a verified pleading asserting a defect in parties. Real Parties cite Rule of Civil Procedure 93(4) and case law supporting their assertions that a failure to file a verified plea in abatement waives any arguments regarding defects in parties. *See* Tex. R. Civ. P. 93 ("A pleading setting up any of the following matters . . . shall be verified by affidavit[:] . . . That there is a defect of parties, plaintiff or defendant."); *see, e.g.,* *Gray v. River Run Prop. Owners Ass'n*, No. 02-24-00224-CV, 2025 WL 421219, at *8 n.14 (Tex. App.—Fort Worth Feb. 6, 2025, pet. denied) (mem. op.) (concluding appellant waived complaint

8

that appellee failed to join purportedly necessary parties by failing to raise the issue in verified pleading in trial court and failing to adequately brief issue on appeal); *Allan v. Nationstar Mortgage, LLC*, No. 14-18-00246-CV, 2019 WL 2939746, at \*3 (Tex. App.—Houston [14th Dist.] July 9, 2019, pet. denied) (mem. op.) (concluding appellant waived complaint that appellee failed to join purportedly necessary party first raised in unverified motion for new trial following summary judgment).

Relators agree that the intervenor companies could have filed a plea in abatement but maintain that the plea in intervention—which was verified—was "a much more efficient and straightforward option" because it cured the Real Parties' failure to join the companies as necessary parties by simply intervening in the lawsuit. Relators point out that the plea in intervention was timely under the scheduling order, which provided nine more months to add parties.

We agree with Relators. The distinction between defendants filing a verified plea in abatement and intervenors filing a verified plea in intervention is an immaterial distinction given these circumstances. *See Sneed v. Webre*, 465 S.W.3d 169, 176 (Tex. 2015) (noting that, in derivative suit, corporations "intervened as indispensable defendants"); *see also Horton v. Stovall*, 591 S.W.3d 567, 567–68 (Tex. 2019) ("Rather than disposing of appeals based on harmless procedural defects, 'appellate courts should reach the merits of an appeal whenever reasonably possible.'" (quoting *Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008)). This is especially true in the derivative-suit context, where the companies "are simultaneously 'plaintiffs' and 'defendants[.]'" *In re Murrin Bros. 1885, Ltd.*, 603 S.W.3d 53, 58 (Tex. 2019) (orig. proceeding); *see also DeBord v. Circle Y of Yoakum, Inc.*, 951 S.W.2d 127, 134 (Tex. App.—Corpus Christi–Edinburg 1997) ("[I]t is well established that the corporation is an indispensable party to a shareholders' derivative suit. . . . Thus, the corporation is joined as a nominal defendant even

though any judgment would run in its favor."), *rev'd on other grounds sub nom. Stary v. DeBord*, 967 S.W.2d 352 (Tex. 1998); *Providential Inv. Corp. v. Dibrell*, 320 S.W.2d 415, 418 (Tex. App.—Houston 1959, no writ) (noting that in derivative suit, the "real party at interest is the corporation," which is "a necessary party to the suit").

Next, Relators argue that the trial court abused its discretion by striking the intervention because Real Parties did not file a motion to strike but instead filed a response opposing the plea in intervention. *See Guaranty Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 657 (Tex. 1990) ("An intervenor is not required to secure the court's permission to intervene; the party who opposed the intervention has the burden to challenge it by a motion to strike."). But like the issue above, this is an immaterial distinction: Real Parties filed a "response to plea in intervention, motion to appoint independent panel and Rule 12 motion to show authority," in which they argued that "[t]he plea in intervention should be stricken," and requested the trial court "to strike the plea in intervention." This is sufficient to constitute a motion to strike the plea in intervention. *See WC 4th & Colorado, LP v. Colorado Third St., LLC*, --- S.W.3d ---, No. 14-22-00764-CV, 2025 WL 1225841, at *3 (Tex. App.—Houston [14th Dist.] Apr. 29, 2025, no pet.) ("[I]n interpreting the nature of a motion or other pleading, we look to its substance, not merely at the form of title given to it." (citing Tex. R. Civ. P. 71)).

Having considered the parties' procedural concerns, we turn to the merits. "Any party may intervene by filing a pleading, subject to being stricken out by the court for sufficient cause on the motion of any party." Tex. R. Civ. P. 60. Rule 60 authorizes a party with a justiciable interest in a suit to intervene as a matter of right. *Nghiem v. Sajib*, 567 S.W.3d 718, 721 (Tex. 2019) (quoting *In re Union Carbide Corp.*, 273 S.W.3d 152, 154 (Tex. 2008) (orig. proceeding) (per curiam)). A party has a justiciable interest in a lawsuit, and thus a right to intervene in the

suit, when its interests will be affected by the litigation. *Massachusetts Bay Ins. v. Adkins*, 615 S.W.3d 580, 602 (Tex. App.—Houston [1st Dist.] 2020, no pet.); *accord In re Estate of Webb*, 266 S.W.3d 544, 548 (Tex. App.—Fort Worth 2008, pet. denied). If a party moves to strike the intervention, the intervenor then bears the burden to show a justiciable interest in the suit, but "the intervenor need only respond to the grounds stated in the motion [to strike]." *Nghiem*, 567 S.W.3d at 721. A trial court abuses its discretion in striking a petition to intervene if (1) the intervenor could have brought the same action, or any part thereof, in his own name, or if the action had been filed against the intervenor, all or part of the recovery could have been defeated by the intervenor; (2) the intervention will not complicate the case by an excessive multiplication of the issues; and (3) the intervention is almost essential to protect the intervenor's interest. *Guaranty Fed. Sav. Bank*, 793 S.W.2d at 657.

Because the test for whether the trial court abused its discretion in striking the interventors' plea in intervention here contemplates whether the intervenors "could have brought the same action, or any part thereof, in [their] own name[s]," we consider the nature of a derivative action. The supreme court recently described derivative actions thus:

> Shareholder derivative actions provide a procedural pathway for a minority shareholder to sue on behalf of the company for wrongs committed against the company. *Sneed v. Webre*, 465 S.W.3d 169, 182–83 (Tex. 2015); *Eye Site, Inc. v. Blackburn*, 796 S.W.2d 160, 162 (Tex. 1990); *see also* Tex. Bus. Orgs. Code §§ 21.552, 101.452 (outlining requirements for derivative suits). Because the suit is to vindicate the company's rights, it is often said that the company is a "plaintiff" in a derivative action. *See, e.g.*, *Ross v. Bernhard*, 396 U.S. 531, 538 (1970); *Clark v. Lomas & Nettleton Fin. Corp.*, 79 F.R.D. 658, 659 (N.D. Tex. 1978); *National Bankers Life Ins. Co. v. Adler*, 324 S.W.2d 35, 36 (Tex. Civ. App.—San Antonio 1959, no writ); *cf. In re Schmitz*, 285 S.W.3d 451, 452 (Tex. 2009) (orig. proceeding). Labeling the company a "plaintiff" does not tell the whole story, however. Most companies begin derivative litigation resistant to the minority shareholder's derivative claims. The resistance of the company's usual decisionmakers to the minority shareholder's claims is what causes derivative

11

litigation in the first place. For this reason, in addition to sometimes being called plaintiffs, companies embroiled in derivative litigation are also commonly called "nominal defendants." *See, e.g.*, *Meyer v. Fleming*, 327 U.S. 161, 167 (1946); *Bankston v. Burch*, 27 F.3d 164, 167 n.10 (5th Cir. 1994); *Neff ex rel. Weatherford Int'l, Ltd. v. Brady*, 527 S.W.3d 511, 518 (Tex. App.—Houston [1st Dist.] 2017, no pet.). Thus, companies in derivative litigation are simultaneously "plaintiffs" and "defendants," depending on how you look at it.

*In re Murrin Bros.*, 603 S.W.3d at 58.

In other words, a derivative suit contemplates that the company both brings and defends against the suit. What makes this case unusual is that the plaintiffs did not name the intervenor companies as defendants, as is typical in derivative suits, and have maintained that the companies are not necessary parties to the suit. *See id.* Instead, Real Parties urge that the intervenor companies' interests are properly represented by them, the plaintiffs in this suit purportedly bringing the derivative claims on the companies' behalf. But this ignores the fundamental nature of derivative suits, in which "both sides will claim to be aligned with the company and acting on its behalf." *In re Heiser*, 711 S.W.3d 775, 782 (Tex. App.—Austin 2025, orig. proceeding). "[T]he side with which the company is truly aligned can be determined only through resolution of the merits of each side's respective claims." *Id.* Under these circumstances, the intervention was an appropriate vehicle to allow the "other side" of the companies' interests to participate in the suit and for the court to assess the merits of each side's claims.

Real Parties asked the trial court to strike the intervention because of their argument above that the intervenor companies do not need to be added to the suit as nominal defendants but are instead "correctly aligned as the complainants in the case." But for the reasons explained above, that is a premature conclusion on the merits of the derivative suit. The intervenor companies' intervention will not "complicate the case by an excessive multiplication of the

issues," as the plea in intervention (which does not assert any counterclaims) does not add to the issues in this case. *See Guaranty Fed. Sav. Bank*, 793 S.W.2d at 657. And the intervention of the intervenor companies as nominal defendants is "almost essential to protect the intervenor's interest," so the "other side" of the companies' interests can be represented in this suit. *Id.* The trial court abused its discretion by granting the motion to strike the intervention.

### *Independent panel*

Next, Relators argue that the trial court abused its discretion by denying the intervenor companies' request to appoint an independent panel to determine how to proceed on the allegations in the derivative claims.

The Texas Business Organizations Code provides a framework for derivative proceedings, codified based on the entity type, including, as relevant to the intervenors here, for LLCs and limited partnerships.[6] *See* Tex. Bus. Orgs. Code §§ 101.451–.463 (derivative proceedings applicable to LLCs); 153.401–.413 (derivative proceedings applicable to limited partnerships). These statutory provisions afford managers and partners the power to exercise their business judgment in deciding whether the company should pursue purported claims, including the requirement of a demand and provisions for mandatory dismissal based upon the good-faith determination by disinterested and independent governing persons or partners, or a special investigative committee that pursuit of the claims is not in the LLC's or limited partnership's best interest. *See id.* §§ 101.454; 153.404; *In re LoneStar Logo & Signs, LLC*, 552 S.W.3d 342, 348 (Tex. App.—Austin 2018, orig. proceeding).

---

[6] Oxbow Land Partners, Hideout on the Horseshoe, and Whitewater Sports are LLCs. Kona Coast Venture is a limited partnership.

13

Before September 1, 2019, most of these provisions did not apply to "closely held" LLCs or partnerships—categories that undisputedly encompass the intervenor companies here. *See* Tex. Bus. Orgs. Code §§ 101.463 (defining closely held LLC); 153.413 (defining closely held limited partnership). But after that date, the Legislature amended the provisions to significantly narrow the scope of the exception applicable to these entities.[7] As amended, the exception for closely held LLCs is confined to derivative claims asserted by members against "a present or former governing person, member, or officer of the limited liability company." *Id.* § 101.463(b). And the exception for closely held limited partnerships is confined to derivative claims asserted by limited partners against "a present or former general partner, limited partner, or officer of the limited partnership." *Id.* § 153.413(b). In other words, the statutory derivative-suit formalities, including the independent-review process and mandatory-dismissal provision, apply to derivative claims asserted by closely held LLC members and limited partners against individuals or entities

---

[7] Many cases cited by Real Parties in their brief are from before these statutory amendments took effect and support their position that a plaintiff pursuing a derivative suit on behalf of a closely held entity does not need to join the entity as a defendant.

that are not a "governing person,[8] member,[9] or officer[10]" of the LLC, *id.* § 101.463(b), or not "a general partner,[11] limited partner,[12] or officer of the limited partnership," *id.* § 153.413(b).[13]

That means to avoid the Business Organizations Code's derivative-suit formalities, Real Parties needed to show that each defendant in this lawsuit is "a governing person, member, or officer" of one of the LLC intervenors (Oxbow Land Partners, Hideout on the Horseshoe, and Whitewater Sports) or "a general partner, limited partner, or officer" of Kona Coast Venture. They have not done so.

Real Parties sued six defendants in this lawsuit: William Korioth; Kona Coast, LLC; WTK Development, LLC; Guadalupe 306, LP; Guadalupe GP, LLC; and TBOTG Development, Inc. It is undisputed that Korioth and Kona Coast, LLC fit into the statutory

---

[8] A "governing person" is "a person serving as part of the governing authority of an entity." Tex. Bus. Orgs. Code § 1.002(37).

[9] In the context of an LLC, a "member" is "a person who has become, and has not ceased to be, a member in the limited liability company as provided by its governing documents or this code." Tex. Bus. Orgs. Code § 1.002(53)(A).

[10] An "officer" is "an individual elected, appointed, or designated as an officer of an entity by the entity's governing authority or under the entity's governing documents." Tex. Bus. Orgs. Code § 1.002(61).

[11] A "general partner" is "each partner in a general partnership; or [] a person who has become, and has not ceased to be, a general partner in a limited partnership in accordance with the governing documents of the limited partnership or this code." Tex. Bus. Orgs. Code § 1.002(33).

[12] A "limited partner" is "a person who has become, and has not ceased to be, a limited partner in a limited partnership in accordance with the governing documents of the limited partnership or this code." Tex. Bus. Orgs. Code § 1.002(49).

[13] The same applies to the trial court's discretion to treat a derivative proceeding as a direct action; that is, it may do so only "if justice requires" and the suit is against a governing person, member, or officer of the LLC or a general partner, limited partner, or officer of the limited partnership. Tex. Bus. Orgs. Code §§ 101.463(c); 153.413(c).

15

exemptions from the derivative-suit formalities, but Relators maintain that the four remaining defendants do not. Specifically, Relators contend that Real Parties cannot establish that each of WTK Development, LLC; Guadalupe 306, LP; Guadalupe 306 GP, LLC; and TBOTG Development, Inc. is "a governing person, member, or officer" of Oxbow Land Partners, Hideout on the Horseshoe, and Whitewater Sports, or "a general partner, limited partner, or officer" of Kona Coast Venture. And Relators argue that Real Parties therefore cannot establish that the derivative-suit formalities do not apply in this suit, meaning that the trial court abused its discretion by denying the intervenor companies' request to appoint an independent panel to determine the merits of the derivative claims.

We agree with Relators. The mandamus record establishes the ownership of each of the intervenors and clarifies that the four remaining defendants are neither "a governing person, member, or officer" of one of the LLC intervenors nor "a general partner, limited partner, or officer" of Kona Coast Venture. First, Kona Coast Venture's first amended and restated agreement of the limited partnership identifies Kona Coast, LLC as the general partner, Korioth and Whitewater Investment Partners as its limited partners, and no officers. Second, Oxbow Land Partners' company agreement identifies Kona Coast Venture as its sole member and indicates that it is member managed.[14] And both Hideout on the Horseshoe's and Whitewater Sports's first amended and restated LLC agreements list its members as those "members identified on the

---

[14] Real Parties' derivative claim asserted on Oxbow Land Partners' behalf is "double derivative" in that it derives from Whitewater Investment Partners' interest in Kona Coast Venture. *See Sneed v. Webre*, 465 S.W.3d 169, 189 (Tex. 2015) ("In a 'double derivative' action, the shareholder is effectively maintaining the derivative action on behalf of the subsidiary, based upon the fact that the parent or holding company has derivative rights to the cause of action possessed by the subsidiary." (quoting *Blasband v. Rales*, 971 F.2d 1034, 1043 (3d Cir. 1992), *overruled on other grounds by In re Cognizant Tech. Sols. Corp. Derivative Litig.*, 101 4th 250 (3d Cir.2024))).

16

signature pages hereto," which includes only Korioth and Whitewater Investment Partners. Indeed, in Real Parties' response to the plea in intervention, they agreed that "Kona Coast [Venture], Hideout, and Whitewater Sports all have the same ownership," and that "Oxbow [Land Partners] is 100% owned by Kona Coast [Venture]."

In sum, none of the four remaining defendants are identified as "a governing person, member, or officer" of one of the LLC intervenors or "a general partner, limited partner, or officer" of Kona Coast Venture. While the derivative claims against Korioth and Kona Coast, LLC are exempt from the derivative-suit formalities, the derivative claims asserted against WTK Development, Inc.; Guadalupe 306, LP; Guadalupe 306 GP, LLC; and TBOTG Development, Inc. are not. *See* Tex. Bus. Orgs. Code §§ 101.463(b) ("In the event the member also asserts a claim in the derivative proceeding against a person who is not a present or former governing person, member, or officer, this subsection applies only to a claim in the derivative proceeding against a present or former governing person, member, or officer."); 153.413(b) ("In the event the limited partner also asserts a claim in the derivative proceeding against a person who is not a present or former general partner, limited partner, or officer, this subsection shall apply only to a claim in the derivative proceeding against a present or former general partner, limited partner, or officer."). Thus, the derivative claims asserted on behalf of the intervenor companies against those four remaining defendants are subject to the derivative-suit formalities, including the independent-panel assessment and mandatory-dismissal requirement. *See id.* §§ 101.454; 153.404.

Real Parties argue that there is "no reason to treat [their] claims against any of these entities differently" because these entities are "not the kind of independent and distinct third-parties that the Legislature intended to enjoy the benefit of the 2019 revisions to

Sections 101.463 and 153.413," as "Korioth controls each of these entities." But Real Parties' argument is inconsistent with the clear language of the statute. Adopting Real Parties' interpretation of what "the Legislature intended" by the 2019 revisions is inconsistent with our directive to discern legislative intent by "rely[ing] on the plain meaning of a statute's words." *Aleman v. Texas Med. Bd.*, 573 S.W.3d 796, 802 (Tex. 2019). "[W]e construe the words and phrases chosen by the Legislature in context rather than in isolation." *Id.* And "[w]e presume that the Legislature chooses a statute's language with care, including each word chosen for a purpose, while purposefully omitting words not chosen." *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). Real Parties' argument attempts to blur the distinct statutory definitions of entities given by the Business Organizations Code in favor of its position that Korioth effectively "controls" all the entities. Accepting this argument would not only disregard the clear language of the exceptions for closely held entities in derivative suits but would also neglect the separate legal identities of the entities. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 798 (Tex. 2002) ("[C]ourts will not because of stock ownership or interlocking directorship disregard the separate legal identities of corporations . . . ." (quoting *Bell Oil & Gas Co. v. Allied Chem. Corp.*, 431 S.W.2d 336, 339 (Tex. 1968))).

Finally, Real Parties argue that the intervenor companies waived the right to invoke the derivative-suit formalities of the Business Organization Code, citing the equitable concept of waiver of rights in other contexts, like arbitration and the certificate-of-merit requirement under section 150.002 of the Texas Civil Practice and Remedies Code. *See, e.g.*, *LaLonde v. Gosnell*, 593 S.W.3d 212, 218–29 (Tex. 2019) (implied waiver of certificate-of-merit requirement); *Accord Bus. Funding, LLC v. Ellis*, 625 S.W.3d 612, 617 (Tex. App.—Houston [14th Dist.] 2021, no pet.) (waiver of right to compel arbitration). Real Parties maintain that under the totality of

18

circumstances considered by courts when determining if a party has waived its statutory rights, Relators impliedly waived the right to invoke the independent-panel provisions in the Business Organizations Code. Specifically, Real Parties cite to the length of time the case was on file before the intervenors requested the independent panel (four years), Korioth's litigation strategy, adverse rulings against Korioth in the suit so far, the extent to which the parties have conducted discovery, Korioth's "control[ of] each of the intervenors," the fact that Korioth and the intervenors share attorneys, and the prejudice that would purportedly afflict Real Parties if the trial court followed the derivative-suit formalities in the Business Organizations Code.

Relators respond that the intervenor companies were not parties to this suit until their plea in intervention filed in January 2025 and characterize Real Parties' decision not to join the intervenors sooner as "an intentional, tactical decision." Further, Relators point to the procedural history of this case, in which, on the same day TBOTG Development filed for bankruptcy and thus triggered a nearly one-year-long stay in this case, Real Parties filed a motion in which, Relators argue, Real Parties asserted for the first time that their claims on behalf of the Kona companies were direct and derivative, as opposed to just derivative. Relators maintain that as soon as the stay was lifted, the intervenor companies filed the combined plea in intervention, motion to appoint an independent panel, and motion to show authority under Rule 12 as to the Real Parties' purportedly direct claims to address this issue. And though Relators filed this motion in January 2025, they point out that the trial court did not rule on the motion until September 2025. In other words, Relators maintain that Real Parties' reference to the length of this suit as indicative of the intervenor companies' implied waiver of statutory rights is instead reflective of conditions before their intervention and beyond their control.

19

We cannot conclude that the equitable concept of waiver applicable in other contexts applies here to bar the intervenor companies' right to request that the trial court appoint an independent panel to assess the derivative claims. The parties have not cited, and we have not found, authority applying waiver in this context of derivative suits and particularly involving the statutory derivative-suit formalities outlined in the Business Organizations Code. Given the nature of derivative suits detailed above, the procedural history of this case, the Business Organizations Code's mandatory language requiring the trial court to appoint an independent panel on the company's request, and the lack of authority applying waiver in this context, we cannot conclude that the intervenor companies impliedly waived their right to move for the trial court to appoint an independent panel to assess the derivative claims. This is especially so because the intervenor companies had not attempted to intervene in the suit until January 2025, when they filed their plea in intervention concurrently with their motion for the trial court to appoint an independent panel. Thus, to conclude that the intervenor companies waived the statutory right to the independent-panel review of the derivative claims, we would have to conclude that the intervenor companies waited too long to intervene. For the reasons discussed above, we do not.

Given the language of the Business Organizations Code—in which the trial court "shall appoint a panel" of "independent and disinterested and [] otherwise qualified" individuals to assess how to proceed on the derivative claims—the trial court abused its discretion by denying the intervenors' motion to appoint such a panel.

Having determined that the trial court abused its discretion in granting Real Parties' motion to strike the plea in intervention and deny the intervenor companies' request to appoint an independent panel pursuant to sections 101.454 and 153.404 of the Business Organizations Code, we likewise conclude that Relators have established that they lack an adequate appellate remedy.

20

This Court, the Texas Supreme Court, and our sister courts of appeals have granted mandamus relief to remedy a plaintiff's noncompliance with other prerequisites for bringing derivative actions. *See In re LoneStar Logo*, 552 S.W.3d at 353 (granting mandamus relief in derivative suit and collecting cases of courts doing the same). We conclude the same here. Given the mandatory statutory language of these provisions, the trial court "shall appoint a panel under Subsection(a)(3)" if it finds that the individual recommended by the intervenor companies is "independent and disinterested and [is] otherwise qualified with respect to expertise, experience, independent judgment, and other factors considered appropriate by the court under the circumstances to make the determinations." Tex. Bus. Orgs. Code §§ 101.454(c); 153.404(c).

## II. Relators have not established their entitlement to mandamus relief from the trial court's order compelling *in camera* review of documents.

Next, Relators contend that the trial court abused its discretion by granting Real Parties' motion to compel production of certain documents from TBOTG Development and Guadalupe 306 that Relators contend are protected by attorney-client privilege. Because an erroneous order requiring the production of privileged documents leaves the party claiming the privilege without an adequate appellate remedy, the questions before us are whether the documents at issue are privileged and have been improperly ordered disclosed. *In re Christus Santa Rosa Health Sys.*, 492 S.W.3d 276, 279 (Tex. 2016) (orig. proceeding).

"The attorney-client privilege exists to facilitate free and open communication between attorneys and their clients." *University of Tex. Sys. v. Franklin Ctr. for Gov't & Pub. Integrity*, 675 S.W.3d 273, 279 (Tex. 2023). The attorney-client privilege is governed by Texas Rule of Evidence 503, under which a "client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating

21

the rendition of professional legal services to the client." Tex. R. Evid. 503(b)(1). "The privilege protects such communications that are between and among the lawyer, the client, and their respective representatives." *Franklin Ctr.*, 675 S.W.3d at 280 (citing Tex. R. Evid. 503(b)(1) and *In re XL Specialty Ins.*, 373 S.W.3d 46, 49–50 (Tex. 2012) (orig. proceeding)). "A communication is 'confidential' if it is not intended to be disclosed to third persons other than (1) those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or (2) those reasonably necessary for the transmission of the communication." *Id.* (citing Tex. R. Evid. 503(a)). "The presence of third persons during the communication will destroy confidentiality, and communications intended to be disclosed to third parties are not generally privileged." *Id.* And the client can waive the privilege if she, "while holder of the privilege, voluntarily discloses or consents to disclosure of any significant part of the privileged matter unless such disclosure itself is privileged." Tex. R. Evid. 511(a)(1).

"At the core of the privilege is the notion that the communications are 'made for the purpose of facilitating the rendition of professional legal services.'" *Franklin Ctr.*, 675 S.W.3d at 280 (quoting *Huie v. DeShazo*, 922 S.W.2d 920, 922 (Tex. 1996)). "[T]he attorney-client privilege is intended to encourage clients to provide counsel with 'full and frank' disclosures so that the resulting legal advice is accurate and helpful, 'thereby promot[ing] broader public interests in the observance of law and administration of justice.'" *Id.* (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). "Without the privilege, clients may withhold information, limiting the effectiveness of legal representation," but "[w]ith candid communication, attorneys can provide optimal legal representation, and clients can obtain the advice they need." *Id.* "However, the mere copying of legal counsel, in and of itself, does not transform an otherwise nonlegal communication into one made for a legal purpose." *Id.* (citing Tex. Att'y Gen. Op. No. JC-0233, at 6 (2000)).

22

And a client "may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney." *Upjohn*, 449 U.S. at 396.

"The party who seeks to limit discovery by asserting a privilege has the burden of proof." *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (per curiam) (orig. proceeding); *see* Tex. R. Civ. P. 193.3 ("Asserting a Privilege"). To meet this burden of proof, that party "must establish by testimony or affidavit a prima facie case for the privilege, although the party need produce only the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *In re National Lloyds Ins.*, 532 S.W.3d 794, 804 (Tex. 2017) (orig. proceeding). "The documents themselves may constitute sufficient evidence to make a prima facie showing of attorney-client . . . privilege." *E.I. DuPont de Nemours*, 136 S.W.3d at 223. "[I]f a party asserting privilege claims makes a prima facie showing of privilege and tenders documents to the trial court, the trial court must conduct an *in camera* inspection of those documents before deciding to compel production." *Id.* Material protected by attorney-client communications and work-product privilege are exempt from the privilege-log disclosure. Tex. R. Civ. P. 193.3(c); *see* Tex. R. Evid. 503(b)(1)(A), (D) (discussing client's privilege to refuse to disclose and prevent any other person from disclosing confidential communications made to facilitate the rendition of professional legal services).

Here, Real Parties sought an order compelling Scott Orr to produce sixty categories of documents requested in a subpoena duces tecum despite Relators' objections. Real Parties specifically sought communications from Orr, who worked for Priest until 2019 and has served as the CFO at TBOTG Development and Guadalupe 306, LP since 2022. Real Parties argued that Orr is "at best" "a dual capacity witness" as both Relators' "litigation consultant" and "a fact

witness who obtained knowledge about the case firsthand" from his work for Priest. Real Parties contended that they are entitled to Orr's documents that "contain relevant facts" regarding his participation in the underlying events that led to this suit.

In response, Relators maintained that they already produced Orr's "non-privileged business communications," and "[t]he only documents that [Relators] have not produced relating to Mr. Orr's work are Mr. Orr's communications with lawyers." Relators continued that Orr is a "client representative" as he is the CFO for two parties, as well as a "lawyer's representative" hired to assist in the rendition of professional legal services, and thus has made and received confidential communications with attorneys regarding this case. In support of this response, Relators attached Orr's sworn declaration, in which he states he was first hired as a litigation consultant for the defendants in this case, then shortly after, he became the CFO of TBOTG Development and Guadalupe 306, LP. Orr states:

> Acting first as a litigation consultant to the Armbrust firm, and then as CFO for Guadalupe 306 and TBOTG, I regularly discuss this case with both companies' attorneys for the purpose of obtaining legal advice concerning on-going litigation, including the bankruptcy case . . . and to assist the lawyers in their work on the litigation. These conversations were intended to be confidential, so that the lawyers could provide legal advice confidentially, and so that I could assist, on behalf of TBOTG and Guadalupe 306, with their litigation efforts including their preparation of this case and the bankruptcy case for trial.

Relators also attached a sworn declaration from Korioth, which states that as the controlling person for Guadalupe 306 and TBOTG Development, he approved Orr's engagement as CFO for both companies and that Orr "is authorized to discuss the litigation and to receive legal advice from, and to assist the attorneys representing both Guadalupe 306 and TBOTG, in this litigation," and TBOTG Development's attorneys in the bankruptcy case. Korioth also states:

24

Since I engaged Mr. Orr in November of 2022 to act as CFO, I have had dozens of discussions with the attorneys representing Guadalupe 306 and TBOTG that include Mr. Orr concerning this litigation and the bankruptcy case. These discussions are for the purpose of obtaining legal advice and assisting the attorneys in this on-going litigation. These conversations were intended to be confidential, so that the lawyers could provide legal advice confidentially, and so that I could assist, on behalf of TBOTG and Guadalupe 306, with their litigation efforts including their preparation of this case and the bankruptcy case for trial.

As the parties resisting discovery, Relators carried their burden of establishing a prima facie showing of privilege through these declarations because they establish the factual basis for the attorney-client privilege they have claimed—that is, that the documents Real Parties seek to compel are communications among Relators and their attorneys for the purpose of receiving legal advice and assisting with this litigation, and those discussions were intended to be confidential. *See In re National Lloyds Ins.*, 532 S.W.3d at 804 ("The party asserting a privilege in opposition to a discovery request must establish by testimony or affidavit a prima facie case for the privilege, although the party need produce only the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true."); *In re Hyde Park Baptist Church*, No. 03-23-00049-CV, 2023 WL 5353367, at *5 (Tex. App.—Austin Aug. 22, 2023, orig. proceeding) (mem. op.) ("[T]he affidavit in this case is not merely conclusory but instead sets forth the factual basis for the applicability of privileges to the documents at issue . . . .").

Because Relators made a prima facie case for its claim of privilege, Real Parties, as the requesting party, had the burden to identify to the court which specific documents or groups of documents it believed required inspection. *See E.I. DuPont de Nemours*, 136 S.W.3d at 226 (quoting *In re Monsanto Co.*, 998 S.W.2d 917, 925 (Tex. App.—Waco 1999, orig. proceeding)). However, Real Parties did not do so. Instead, at the hearing on the motion to compel, Real Parties made their request for these documents, despite Relators' objections, clear:

25

The purpose of our motion fundamentally, Your Honor, is to discover factual statements by Mr. Orr that have been made at any time, to anyone, that are facts relating to his time working for our folks. And in our motion we cite the *Axelson*[, *Inc. v. McIlhany*, 798 S.W.2d 550 (Tex. 1990)] case out of the supreme court on this concept of a witness who's got a dual capacity, and the idea that you cannot cloak, you cannot shield the information in the statements of a witness which relate to their work on the very thing that's at issue in a case. . . . Defendants have decided to argue that everything is fair game in terms of what our clients have done in the past, in an effort to find something they can characterize as a violation of the Kona agreement, which would then somehow excuse their client, Mr. Korioth, from violating the Kona agreement. So what we are trying to get from the other side, Your Honor, is the communications of Scott Orr at any point in time, not from the lawyers to Scott Orr, but from Scott Orr to anyone, in particular, discussing the history of Andy Priest, Priest Equities, the members of the Whitewater Investment Partners or Whitewater Investment Partners. . . . My question is what has Scott Orr divulged and how has he described it and what is his factual statement about the work that he did and the knowledge that he has, that's insider knowledge of our folks? And we should be able to get that.

In response, Relators' counsel clarified:

We have produced all, and I do mean all, of the documents that Scott Orr has produced as a business executive, a business representative, of all of the Defendants. . . . The only category of documents that we have not produced and are asserting a privilege over, are communications between Mr. Orr, who serves as the CFO to two Defendants in this case, Guadalupe 306 and TBOTG, between him and the lawyers representing those two entities.

Before the hearing concluded, the following exchange happened:

The trial court: If Mr. Orr sent [Relators' counsel] an email today and said, oh, I remember this thing that happened in 2021, here is what I remember, and gives you all these facts, do you think that should be produced or not produced? . . . Is that what you are asking about, [Real Parties' counsel]?

Real Parties' counsel: Yes.

The trial court generally granted the motion to compel without specifying which documents or categories of documents must be produced. In its order, the trial court specified that

it found Orr "has pre-litigation and pre-dispute knowledge, as well as post-dispute knowledge, of matters relating to the parties, including Whitewater Investment Partners, Andy Priest and Priest Equities," such that the documents sought in Real Parties' motion to compel must be produced. But the court ordered "that the production of any documents the Defendants consider to be privileged is to be made to the Court for purposes of *in camera* inspection to determine matters of privilege and discoverability," or "should Defendants prefer," the court would "assign a discovery master for such inspection." The court further ordered that "production of allegedly-privileged materials by Defendants and Mr. Orr to the Court or the Discovery Master is not a waiver of any claim or right of Defendants to resist production to Plaintiffs or Third-Party Defendants."

In short, the order on the motion to compel does not specifically require Relators to produce—for *in camera* review or otherwise—documents or categories of documents that Relators maintain are protected by attorney-client privilege. Given the clear authority protecting attorney-client communications from disclosure and even privilege-log requirements, we do not read the order to do so. *See* Tex. R. Evid. 503(b) ("A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made to facilitate the rendition of professional legal services . . . ."); Tex. R. Civ. P. 193.3(c). Relators made the prima facie case for their claim of attorney-client privilege through the affidavits quoted above, which include the "minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *See In re National Lloyds Ins.*, 532 S.W.3d at 804. Because there is sufficient evidence about the privileged nature of the attorney-client communications, and because Real Parties did not identify any specific document or categories of documents that they believe require further inspection by the court, we do not read the court's order to require any *in camera* review or production of any attorney-client communications.

27

Further, as to the other documents sought by the motion to compel that are not attorney-client communications, the trial court has not yet ordered that Relators produce any other documents that they contend are privileged; instead, the trial court has ordered that the Relators produce allegedly privileged documents to the trial court or a discovery master for *in camera* inspection.[15] That is not a clear abuse of discretion. *See In re WHC, LLC*, 570 S.W.3d 349, 353 (Tex. App.—El Paso 2018, orig. proceeding) ("If the party asserting the privilege establishes a *prima facie* case for the privilege and 'tenders documents to the trial court, the trial court must conduct an *in camera* inspection of those documents before deciding to compel production.'" (quoting *In re Christus Santa Rosa Health Sys.*, 492 S.W.3d at 279)); *cf. Salazar v. Coastal Corp.*, 928 S.W.2d 162, 172 (Tex. App.—Houston [14th Dist.] 1996, no writ) (concluding that trial court's failure to conduct *in camera* inspection of allegedly privileged documents before making production to opposing party was abuse of discretion).

To be sure, Rule 503 does not exempt privileged communications that contain "factual statements" about the underlying case from the category of privileged attorney-client communications as described above—for which Relators have established their prima facie case of privilege. *See* Tex. R. Evid. 503; Tex. R. Civ. P. 193.3(c); *In re ExxonMobil Corp.*, 97 S.W.3d 353, 357 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding) ("The

---

[15]    Relators maintain that the "only documents at issue" are attorney-client communications, but the record does not make that clear. The motion to compel sought documents related to sixty broad categories, and the trial court's order generally granted the motion. *Cf. In re Hyde Park Baptist Church*, No. 03-23-00049-CV, 2023 WL 5353367, at *1 (Tex. App.—Austin Aug. 22, 2023, orig. proceeding) (mem. op.) (resisting discovery as to five discrete documents or categories of documents sought by subpoena duces tecum). Though Relators have sufficiently established their right to resist discovery as to the attorney-client communications, we cannot say that this is the only privilege that may apply to the broad categories of documents to which the order granting the motion to compel applies.

attorney-client privilege, however, attaches to the complete communication between attorney and client, including both legal advice and factual information." (citing *Huie*, 922 S.W.2d at 923)); *see also Harlandale Indep. Sch. Dist. v. Cornyn*, 25 S.W.3d 328, 334 n.12 (Tex. App.—Austin 2000, pet. denied) ("It is inconceivable that an attorney could give sound legal advice on a client's case if he or she did not include an application of the law or opinion to the specific facts of the case." (quoting *Pittsburgh Corning Corp. v. Caldwell*, 861 S.W.2d 423, 425 (Tex. App.—Houston [14th Dist.] 1993, no writ))); *Pittsburgh Corning*, 861 S.W.2d at 425 (noting that "the relevant facts of a case may not be hidden under the guise of privilege" but that "those facts are discoverable through other *proper* means of discovery, without forcing the production of a privileged document which may also contain that factual information"). And despite Real Parties' arguments at the hearing, this rule applies to communications "*to or from* a lawyer or a lawyer's representative," not just communications "from the lawyers." Tex. R. Civ. P. 193.3(c) (emphasis added); *see* Tex. R. Evid. 503(b). Because Relators carried their burden to make a prima facie showing that these communications, including those discussing factual information, are protected by attorney-client privilege, we likewise do not read the trial court's order to require Relators to produce these documents to the court or special master for *in camera* inspection or to Real Parties.

Real Parties' argument based on *Axelson*'s discussion of attorney-client privilege is inapposite because that case involved a waiver of the privilege. *See* 798 S.W.2d at 553–54. Real Parties also argue *Axelson*'s discussion of dual-capacity witnesses is on point here, pointing to Orr's factual knowledge of Priest's real-estate investments. *See id.* at 554 (noting that "the factual knowledge and opinions acquired by an individual who is . . . an active participant in the events material to the lawsuit are discoverable" and cannot be "shielded from discovery by merely changing the designation of a person with knowledge of relevant facts to a 'consulting-only

29

expert.'"). Real Parties contend that Korioth cannot "shield" Orr's factual knowledge from discovery by designating him as a litigation consultant or by having Orr divulge confidential knowledge gained from his prior work for Priest to counsel. But that is inconsistent with Relators' assertion of privilege here. While Orr was first engaged as a litigation consultant by Relators' counsel, he soon after became CFO of two parties: TBOTG Development and Guadalupe 306. Orr, on behalf of TBOTG Development and Guadalupe 306, can therefore assert the privilege over confidential attorney-client communications as the Rules of Civil Procedure provide. *See* Tex. R. Civ. P. 193.3(c). To the extent that Real Parties seek Orr's "factual knowledge and opinions" concerning the period when he worked for Priest, that information is discoverable through "other proper means of discovery" that do not violate attorney-client privilege. *See Pittsburgh Corning*, 861 S.W.2d at 425.

To the extent that there are any documents sought in the motion to compel besides the attorney-client communications that Relators also maintain are privileged, Relators are entitled to *in camera* review if such review is critical to evaluating the privilege claim before Relators may be ordered to produce those documents. *See In re Living Ctrs. of Tex., Inc.*, 175 S.W.3d 253, 261 (Tex. 2005) (orig. proceeding) ("[A] trial court abuses its discretion when it fails to conduct an adequate *in camera* inspection of documents when such review is critical to evaluation of a privilege claim."). And, as the order notes, Relators are not precluded from "resist[ing] production" by seeking mandamus relief from any future order compelling the production documents after *in camera* review that Relators maintain are privileged. But because Relators have not established that the trial court abused its discretion by this order, we deny their request for mandamus relief on the motion to compel.

## CONCLUSION

We conditionally grant the petition for mandamus relief in part as to the trial court's October 2, 2025 order striking the intervenor companies' plea in intervention and denying the intervenor companies' motion to appoint an independent panel pursuant to the Business Organizations Code sections 101.454 and 153.404. The trial court is to vacate this order and, in further proceedings, consider the factors in subsections 101.454(c) and 153.404(c) for the individual proposed by the intervenor companies in their motion. We are confident that the trial court will promptly comply, and our writ will issue only if it does not.

Because Relators have not shown their entitlement to mandamus relief from the trial court's order granting Real Parties' motion to compel, we deny the petition for mandamus relief in part.

_____

Rosa Lopez Theofanis, Justice

Before Justices Triana, Kelly, and Theofanis

Filed: January 22, 2026

31